Martha S. SUTHERLAND, as Trustee of the Martha S. Sutherland Revocable trust dated August 18, 1976, Plaintiff,

v.

Perry H. SUTHERLAND, Todd L. Sutherland, and Mark B. Sutherland, Defendants,

and

Dardanelle Timber Co., Inc., and Sutherland Lumber Southwest, Inc., Nominal Defendants.

C.A. No. 2399–VCL.

Court of Chancery of Delaware.

Submitted: Feb. 7, 2008.
Decided: May 5, 2008.

J. Travis Laster, Esquire, Matthew F. Davis, Esquire, Abrams & Laster, LLP, Wilmington, DE; Bonita L. Stone, Esquire, Stewart T. Kusper, Esquire, Katten Muchin Rosenman, LLP, Chicago, IL, for the Plaintiff.

Robert S. Saunders, Esquire, Skadden Arps Slate Meagher & Flom, LLP, Wilmington, DE, for the Individual Defendants.

A. Gilchrist Sparks, III, Esquire, S. Mark Hurd, Esquire, Jay N. Moffitt, Esquire, Morris Nichols Arsht & Tunnell, LLP, Wilmington, DE, for the Nominal Defendants.

## OPINION

LAMB, Vice Chancellor.

This case concerns a derivative (and double derivative) complaint filed by a 25% stockholder of a closely held corporation with the support of her brother, who is also a 25% stockholder of the corporation. In response to the matters alleged in the complaint, the companies established a one-man *Zapata* special litigation committee to conduct an investigation. The committee has finished its investigation, memorialized its findings in a written report, and concluded that it is not in the best interests of the companies to pursue the litigation. Relying on the special litigation committee's report and conclusions, the companies have filed a motion to dismiss the complaint.

Following discovery, the plaintiff resists the motion, arguing that the committee lacked independence, did not act in good faith, conducted an unreasonable investigation, and lacked reasonable bases for its conclusions. Having considered the briefs, affidavits, and arguments of the parties, the court concludes that the special litigation committee has not satisfied the court

that it acted in good faith and conducted a reasonable investigation. Therefore, the motion to dismiss will be denied.

## I.[1]

Dardanelle Timber Company is a family owned and operated Delaware corporation, which, in part through its wholly owned subsidiary Southwest, Inc., is in the business of operating retail lumber yards and stores. Both companies were founded by Dwight D. Sutherland, Sr. ("Dwight Sr."), who served as president until his death in October 2003.

Approximately three decades ago, Dwight Sr. gave 25% of Dardanelle's common stock to each of his children: Martha, Dwight Jr., Perry, and Todd. At the time, Dwight Sr. and his wife Norma jointly owned all of Dardanelle's preferred stock, which carries voting rights. After Dwight Sr.'s death, the shares of preferred stock were transferred to a trust for Norma's benefit.

Despite the even split of the common equity between the siblings, Perry and Todd have voting control over Dardanelle and Southwest because Perry is the trustee for Norma's trust, and Todd has allied himself with Perry. Perry and Todd constitute a majority of Southwest's three-member board, a majority of Dardanelle's board, and serve as the principal officers of both companies. Mark Sutherland, the third individual defendant, is a cousin and serves as the third director of both Dardanelle and Southwest. Martha was a director of Southwest until February 20, 2004. On that date, Dardanelle, the sole stockholder of Southwest, called an annual meeting for Southwest at which the number of Southwest directors was reduced to three and each of Perry, Todd, and Mark was elected to the board, in effect removing Martha from Southwest's board of directors.[2]

Relying upon the documentation she received as a result of a hard-fought action brought pursuant to 8 *Del. C.* § 220, Martha filed this suit on September 6, 2006. The complaint is in three counts: the first is for breach of fiduciary duty and asserts claims derivatively on behalf of Dardanelle; the second count is for waste; the third count is for breach of fiduciary duty and asserts double derivative claims on behalf of Southwest. Although not a named plaintiff, Dwight Jr., a lawyer, supports Martha in bringing this action.

Centrally, the complaint alleges that the individual defendants have used the companies' "corporate funds and assets for personal benefit."[3] Specifically, the complaint asserts that Perry and Todd have caused the companies to pay for (1) personal flights they have taken on the corporate airplane; (2) personal tax and accounting services provided to them by Cimarron Lumber & Home Supply Company, Ltd., a Dardanelle affiliate; (3) use of a facility commonly known as the Maysville Training Center for personal vacations; and (4) "things [such] as rental cars, expensive hotels, limousines, club memberships, chartered private railroad cars for extended personal trips, private parties and personal living expenses, among many others."[4]

---

1. The facts of the case are extensively set forth in two prior opinions of the court. *See Sutherland v. Sutherland,* No. 2399, 2007 WL 1954444 (Del.Ch. July 2, 2007); *Sutherland v. Dardanelle Timber Co.,* No. 671, 2006 WL 1451531 (Del.Ch. May 16, 2006).

2. The next day, Perry, Todd, and Mark approved employment agreements for Perry and Todd.

3. Compl. ¶ 98.

4. *Id.* ¶ 64.

The complaint also challenges the decision to purchase the aircraft in the first instance, alleging that the aircraft serves no legitimate business purpose. The complaint further alleges that Perry and Todd's decision to approve their own employment agreements at a February 21, 2004 board meeting constitutes waste and a breach of fiduciary duty. Martha asserts that the agreements pay Perry excessively for "part-time" work and contain excessive perquisites, such as payment for personal use of the aircraft and for personal tax and accounting services. Finally, the complaint bases its breach of fiduciary duty and waste claims on allegations that the individual defendants' improperly caused Dardanelle to spend over $500,000 to defend against Martha's section 220 action, and improperly amended Dardanelle's bylaws pursuant to 8 *Del. C.* § 102(b)(7) to include a limitation of liability provision.

In response to the September 6 complaint, the boards of directors of both Dardanelle and Southwest amended the companies' bylaws by unanimous written consent. The written consents increased the number of directors from three to four, appointed Bryan Jeffrey as a member of each board, and formed a special litigation committee consisting solely of Jeffrey (the "SLC"). Jeffrey was given final and binding authority with respect to the claims asserted in the September 6 complaint. He then hired independent counsel.

Following a December 18, 2006 hearing, the court agreed to stay this action while Jeffrey conducted his investigation. On March 26, 2007, Jeffrey filed his report with the court, concluding that the companies should not pursue any of the claims alleged in the September 6 complaint. Dardanelle and Southwest, relying on that report, then moved to dismiss. Martha conducted limited discovery into the independence and good faith of the SLC, as well as the reasonableness of the SLC's investigation and conclusions. She now opposes the companies' motion to dismiss, arguing that the SLC was not independent, lacked good faith, conducted an unreasonable investigation, and lacked reasonable bases for its conclusions.

## II.

The parties agree that *Zapata Corporation v. Maldonado*[5] and its progeny articulate the legal standard governing this court's decision whether to grant the SLC's motion. A motion to dismiss brought in response to a report of an SLC is a hybrid motion created by *Zapata* which takes qualities from a Court of Chancery Rule 41(a)(2) motion to dismiss and a Court of Chancery Rule 56 motion for summary judgment.[6] As such, a *Zapata* motion "is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself."[7] Under *Zapata*, then, the court makes inquiry into whether the special committee was independent, whether the investigation was conducted in good faith, and whether the committee had a reasonable basis for its conclusion.[8]

5. 430 A.2d 779 (Del.1981).

6. *Kaplan v. Wyatt,* 484 A.2d 501, 506–07 (Del. Ch.1984).

7. *Id.* at 507; *see also Katell v. Morgan Stanley Group, Inc.,* No. 12343, 1995 WL 376952, at *12 (Del.Ch. Jun. 15, 1995).

8. *Zapata,* 430 A.2d 779; *Lewis v. Fuqua,* 502 A.2d 962, 966 (Del.Ch.1985); *Kaplan,* 484 A.2d at 506.

The SLC is not entitled to any presumptions of independence, good faith, or reasonableness.[9] Rather, the corporation has the burden of proof under Rule 56 standards, which require the corporation to establish the absence of any material issue of fact and its entitlement to relief as a matter of law.[10] In addition, as the court in *Kaplan v. Wyatt* noted, the motion must be supported by a thorough record.[11] "[I]t seems . . . that what the Committee did or did not do, and the actual existence of the documents and the persons purportedly examined by it, should constitute the factual record on which the decision as to the independence and good faith of the Committee, and the adequacy of its investigation in light of the derivative charges made, must be based."[12] Each side has the opportunity to make a record on the motion.[13] If the court is satisfied with the SLC's independence and good faith, and the reasonableness of its inquiry, the court may nonetheless exercise its own business judgment and deny the motion to dismiss.[14]

## III.

### A. *Independence*

To establish independence, the court must be persuaded that the SLC "can base its decision on 'the merits of the issue rather than being governed by extraneous consideration or influences.' "[15] As the court in *In re Oracle Corporation Derivative Litigation* noted, the inquiry into the independence of SLC members is a narrow one.[16] The court conducts the inquiry without regard to whether the members acted in good faith, or conducted a reasonable investigation.[17] Rather, the court investigates the members' personal interest in the disputed transactions, and "scrutinizes the members' relationship with the interested directors."[18] It should be noted that one-member SLCs are less

9. *Id.*

10. *Zapata*, 430 A.2d 779; *Lewis*, 502 A.2d at 966.

11. *Kaplan*, 484 A.2d at 506.

12. *Id.* at 519.

13. *Zapata*, 430 A.2d 779; *Lewis*, 502 A.2d at 966.

14. *Kaplan*, 484 A.2d at 509. "This discretionary step is designed to prevent situations where the Special Committee complied with all the technical requirements of *Zapata*, but the outcome violates the spirit of that procedure." *Katell*, 1995 WL 376952, at *13.

15. *Katell*, 1995 WL 376952, at *7 (quoting *Kaplan*, 499 A.2d at 1189); *see also In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938 (Del.Ch.2003) (stating "[t]he question of independence 'turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind' ") (quoting *Parfi Holding*

*AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del.Ch.2001)).

16. *See In re Oracle*, 824 A.2d at 947. In *Oracle*, the SLC interviewed 70 witnesses, met with its counsel 35 times for a total of 80 hours, and produced a report totaling 1,110 pages—excluding appendices and exhibits. Nonetheless, the court found that the members lacked independence, and denied the SLC's motion to dismiss.

17. *See id.* at 947 (finding that SLC members were not independent, even though "nothing in this record leads me to conclude that either of the SLC members acted out of any conscious desire . . . to do anything other than discharge their duties with fidelity," and concluding that such an inquiry "is not the purpose of the independence inquiry").

18. *Katell*, 1995 WL 376952, at *8 (citing *Lewis*, 502 A.2d at 967); *see also Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, No. 13950, 1997 WL 305829, at *10 (Del.Ch. May 30, 1997).

insulated from the influence of interested directors,[19] and are closely scrutinized.[20]

Martha points to four facts to establish Jeffrey's lack of independence. In making this argument, Martha relies heavily on the heightened burden that one-member SLCs face. First, Martha points out that Jeffrey destroyed notes he took during witness interviews. She asserts that "[t]he conscious destruction of interview notes by Jeffrey and SLC Counsel … rebuts the bald contention that Jeffrey's independence somehow is shown…."[21] Second, Martha argues that Jeffrey had a prior relationship with Mark Sutherland that the SLC acknowledged, but failed to sufficiently disclose. According to Martha, the SLC disclosed that Jeffrey knew Mark socially while Mark and his wife lived in Little Rock, Arkansas—where Jeffrey still lives and works—and that Jeffrey did substantial accounting work for Mark's wife, preparing quarterly and other financial statements for her antique business over some unknown period of time. However, Martha argues, Jeffrey has failed to disclose the extent of that work, including the amount of compensation Jeffrey received.

Third, Martha argues that Jeffrey has a financial interest in this litigation sufficient to question his independence. Specifically, Martha points to the $250 per hour Jeffrey receives for his service as a director of the companies, and the retention of Jeffrey's firm to do $25,000 worth of "clerical work" related to the investigation. Finally, Martha contends that Jeffrey, Dardanelle, and Southwest have an ongoing "secret finan-

cial relationship" under which the companies pay Jeffrey his $250 hourly rate for work unrelated to his duties as a director. In support, Martha points to the fact that Jeffrey attended a store inventory in Texas after the report was issued, for which he was paid his hourly rate.

Although the SLC in this case had only one member, it has met its burden to show the absence of material fact about its independence. First, previous decisions of this court have flatly rejected the argument that an SLC acts improperly when its members and counsel destroy their original, handwritten interview notes.[22] Regardless, such an argument is irrelevant to an inquiry into the SLC's independence, as it more properly reflects on the SLC's good faith.[23]

Second, Martha unfairly characterizes the amount of information the record contains as to Jeffrey's prior relationship with Mark. The SLC provided a sworn interrogatory answer indicating Jeffrey had prepared periodic financial statements for Mark's wife's antique business, and that the amount billed and paid for that work did not exceed $5,000. Likewise, Jeffrey testified at his deposition that he performed accounting work for Mark's wife 10–15 years ago, that the financial statements were prepared monthly or quarterly, and that he had not seen or spoken with Mark or Mark's wife since Mark's relocation to Kansas City six years ago. Even in the context of a one-member SLC, this *de minimus* relationship ending six years ago does not raise a material ques-

19. *In re Oracle,* 824 A.2d at 940 (noting that "[a] small number of directors feels the moral gravity—and social pressures—of [the duty to decide whether to sue fellow directors] alone").

20. *See Lewis,* 502 A.2d at 967.

21. Pl.'s Ans. Br. 16.

22. *See Kaplan,* 484 A.2d at 517, 520. *See,* however, the discussion regarding the deficiency of the interview summaries prepared by the Special Committee or its counsel at Section III.B.2, *infra.*

23. *See id.* at 517.

tion as to Jeffrey's independence. Indeed, as the court stated in *In re Oracle Securities Litigation*, "business dealings seldom take place between complete strangers and it would be a strained and artificial rule which required a director to be unacquainted or uninvolved with fellow directors in order to be regarded as independent."[24]

Further, the mere fact Jeffrey received his standard hourly rate for his work is of no consequence; anyone who conducted the investigation would have asked to be compensated, and it was reasonable to pay Jeffrey his standard hourly rate. Also, there is no suggestion that the approximately $64,000 Jeffrey received for his work, and the $25,000 his firm received for its work, were so large as to render Jeffrey dependent upon or beholden to that compensation, thereby tainting his independence. In short, as this court has previously held, Jeffrey's compensation is not reason in itself to find he lacked independence.[25]

Finally, with regard to the alleged "secret financial relationship" between Jeffrey and the companies, Jeffrey testified at his deposition that he viewed his attendance at the store inventory as part of his duties as a director. As Jeffrey explained, his counsel told him he was not on the board simply as an SLC member, but as a full member of the board. As such, counsel rightly informed Jeffrey that he should take an active role in informing himself of the companies' business. Jeffrey's visit to the store was left unmentioned in the report because it had not occurred at the time the report was written. There was nothing about the visit suggesting Jeffrey lacks independence. Thus, Martha has not identified any facts suggesting Jeffrey lacks independence.

To the contrary, numerous facts demonstrate that Jeffrey was, in fact, independent. Jeffrey testified that his friend Harry Cummins, then the United States Attorney for the Eastern District of Arkansas, and not the interested directors, identified Jeffrey as a potential board candidate. Also, outside the *de minimis* contact Jeffrey had with Mark's wife, Jeffrey had no previous relationship with any of the defendants.[26] Jeffrey hired independent counsel to support him in his investigation,[27] and is, himself, a named partner in a reputable Arkansas accounting firm. Thus, Jeffrey had a strong incentive to act independently from Perry, Todd, and Mark, thereby maintaining his credibility and reputation.[28] For these reasons, the court finds that Jeffrey was independent.

**24.** 852 F.Supp. 1437, 1442 (N.D.Cal.1994) (applying Delaware law).

**25.** *See In re Limited, Inc.*, No. 17148, 2002 WL 537692, at *4 (Del.Ch. Mar. 27, 2002) (stating "[a]llegations as to one's position as a director and the receipt of director's fees, without more, however, are not enough for purposes of pleading demand futility"); *Grobow v. Perot*, 539 A.2d 180, 188 (Del.1988) (stating that allegations that the directors were paid for their services as directors, "without more, do not establish any financial interest" sufficient to find the directors lacked independence) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

**26.** *See Carlton Inv.*, 1997 WL 305829, at *11 (finding SLC members disinterested where they did not have "any prior affiliation" with the company or any of the defendants).

**27.** *Katell*, 1995 WL 376952, at *10; *see also Carlton Inv.*, 1997 WL 305829, at *11.

**28.** *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1052 (Del.2004) (holding that "[t]o create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director").

B. *Good Faith And Reasonable Investigation*

■ The SLC's report in this case outlines an investigation that was, in many respects, exhaustive and time-consuming. The SLC reviewed documents relating to 78 flights paid for by Dardanelle or Southwest between October 2001 and December 2006 in order to determine how many times Perry and Todd took personal flights on the companies' aircraft, and how many of those were either paid for by Perry and Todd or included in their W–2s as compensation.[29] The SLC also interviewed several Cimarron employees to determine how much work Cimarron did for Perry and Todd, and how billing rates for that work were determined. Nonetheless, significant errors or shortcomings exist in the SLC's report that undermine the court's confidence in the SLC's entire investigation. The most salient of these are discussed below.

1. *Failure To Investigate The Leo King Payments*

Dardanelle made two payments totaling $95,950 to a Leo King for improvements King made to Perry's house in 2000 and 2001. These amounts are reflected in Perry's 2000 and 2001 W–2s, and represented a large portion of Perry's total compensation of approximately $170,000 for each year. Despite this fact, the SLC's report omits any mention of these payments, including who approved the payments or how they were approved. Rather, it was Martha who, having discovered evidence of the payments during review of the 14,000 documents the SLC produced as a result of discovery, presented the evidence to the court.

Jeffrey submitted an affidavit as part of the companies' reply brief stating he was aware of the payments when writing the report. At oral argument, counsel for the SLC reiterated that the SLC was aware of the payments to King.[30] Counsel offered the explanation that the SLC excluded mention of the payments from the report because Perry's compensation was reasonable even including those payments, and because any claims related to the payments were subject to a strong statute of limitations defense.

This explanation is entirely insufficient. Notably, while omitting reference to these large payments, the SLC found it useful to include exculpatory information of a similar character from the same time period, stating "the Special Committee concludes that Perry purchased certain construction materials at cost from Cimarron in 1999–2000, a benefit generally available to the members of the Sutherland family, which in all events did not constitute self-dealing as there was no detriment to either Cimar-

---

29. The SLC concluded that 19 of those flights were personal flights taken by Perry, 15 of which were added as income to Perry's W–2s, and four Perry paid for personally. The SLC concluded that no other flights should have been billed to Perry. Similarly, the SLC concluded that Todd was invoiced for personal flights 20 times and that, based on conversations with the lead pilot of the aircraft, no other flights should have been billed to Todd personally. The SLC states that it verified that Todd, not the companies, paid for those 20 flights.

30. At oral argument, counsel suggested that Dwight Sr. had authorized the King payments. When asked for the source of that information, counsel responded that Perry had told them, but that there was no written record of such authorization. Hr'g Tr. 29–30. As discussed in further detail herein, the SLC's summary of its interview with Perry makes no mention of this line of questioning, or Perry's responses, thus precluding the court's investigation into counsel's representation.

ron or the companies."[31] The incongruity between omitting analysis of the large, possibly suspicious payments, yet referencing the innocent, generally available discount, raises significant questions as to the good faith of the SLC's work.

These questions are made all the more significant when the court considers that the King payments go to the very heart of Martha's complaint and, even taken individually, represent the largest payments to Perry that either party has identified. If the SLC believed there were strong defenses to claims premised on the King payments, then the SLC should have included that analysis in its report. In this case, where an SLC seeks to wrest control of litigation from 50% stockholders in a closely held corporation, the SLC's decision not to conduct that analysis, but, instead, to omit any mention of the King payments, gives rise to substantial questions concerning the reasonableness and good faith of the SLC's investigation.

### 2. *The Interview Summaries*

Related to the King issue is the perfunctory nature of the SLC's interview memoranda. Several of the most important interview summaries fail to record the witnesses' answers at all. Instead, there is just a thumbnail summary of the areas covered during the SLC's interviews. Without this information, the court is unable to ascertain the reasonableness of the SLC's investigation.

For example, the summary of the SLC's interview with Perry notes merely that Perry "responded to questions from the Special Committee regarding stays at the Lowell Hotel, explained that he had invited Todd on certain trips on the aircraft as his guest, and responded to questions about the construction of his home, the history of

the Sutherland family and companies and the Companies' current real estate holdings."[32] The summary gives no indication as to how extensively the SLC questioned Perry about these allegations, and does not contain any record of what the SLC learned from Perry.

In addition, although the SLC's counsel stated at the hearing that Perry reported that Dwight Sr. authorized the King payments, the Perry interview summary makes no mention of that fact. Indeed, the Perry interview summary does not record that the SLC asked any questions about the King payments at all. At most, the summary simply states that the SLC asked questions about the construction of Perry's home, which may only be a reference to the fact that Sutherland family members were able to purchase building supplies from Cimarron at a wholesale price. In short, interview summaries such as Perry's do not assure the court of the good faith or integrity of the SLC's work.

### 3. *Failure To Conduct A Reasonable Investigation Of Payment Of Personal Expenses By The Companies*

During an interview with the SLC, Martha and Dwight Jr. urged the SLC to inspect the companies' general ledgers for evidence that the companies paid Perry's and Todd's personal expenses. The SLC agreed to investigate the ledgers. However, the desultory investigation Jeffrey undertook raises additional questions about the reasonableness and good faith of that investigation.

Jeffrey testified at his deposition that he traveled to Kansas City to review the general ledgers, and arrived at the companies' offices at 8:30 in the morning. After meeting with members of the accounting de-

---

31. Report 118.

32. Moffit Aff. Ex. F at 3.

partment, Jeffrey began reviewing the general ledgers. According to Jeffrey, he began by reviewing the ledgers of the past three or four years, and reviewed mainly travel accounts and miscellaneous expense accounts. Over the course of his review, Jeffrey noticed that Perry had a vendor number and asked the accounting department to run a report listing each check made to Perry between 2001 and 2006. Jeffrey reviewed the resulting report for any instances of checks written to Perry for reimbursement of his personal expenses. Jeffrey also spot-checked between 5 and 10 invoices to test whether or not the accounting records were accurate. He left at 3:30 p.m., having taken an hour lunch.

Perhaps more notable than what Jeffrey did is what Jeffrey did not do. Jeffrey testified at his deposition that, although he is a certified public accountant, he did not arrive at the companies' offices with a plan for how he was going to conduct the review. He did not take any notes. Thus, there is no written record of what he did. Jeffrey testified that he did not review a statistically significant number of invoices when testing whether the accounting records were accurate. He did not verify that the vendor number he asked the accounting department to run was Perry's

only vendor number. And he conducted no search for payments the companies may have made to third parties on Perry's behalf. For instance, if Perry used Maysville and Maysville then invoiced the companies rather than Perry, Jeffrey's investigation would not have found the check sent to Maysville on Perry's behalf.[33] Nor, as Jeffrey testified, would he have found checks the companies made to credit card issuers on Perry's behalf. Indeed, Jeffrey testified that his review of the ledgers would have failed to capture the two large payments made to King on Perry's behalf.

Given the importance of the general ledgers to claims alleged in the complaint, as well as the fact that this case involves a one-man SLC seeking to seize control of litigation from 50% stockholders of the companies, the SLC has not proven the reasonableness of its investigation into claims that the companies paid Perry's and Todd's personal expenses. Therefore, the motion to dismiss will be denied because "the SLC's selective investigation ... [does] not adequately address all of [Martha's] claims."[34] Further, because the court finds sufficient cause to reject the SLC's report in light of the above problems, the court need not consider the other

---

33. It should be noted that nothing in the SLC's report indicates that the SLC reviewed all of Maysville's invoices to ensure that Perry and Todd, rather than the companies, were billed for their personal visits. Rather, the SLC identifies in the report the dates on which Perry and Todd used Maysville for personal reasons—with little indication as to how those dates were determined—and states it verified that all invoices from Maysville to Perry and Todd were included in their W–2s. *See* Report 48–50.

34. *Electra Inv. Trust, PLC v. Crews*, No. 15890, 1999 WL 135239, at *6 (Del.Ch. Feb. 24, 1999). The court also notes that, as explained in a prior opinion in this case, the

report is wholly devoid of citations to key documents or interview summaries. *See Sutherland v. Sutherland*, No. 2399, 2008 WL 571253 (Del.Ch. Feb. 14, 2008). In addition, the SLC did not enter any of the underlying documents, interview summaries, affidavits, or deposition transcripts into the record until it filed its reply to Martha's opposition. Needless to say, these facts do not enhance the court's confidence in the SLC. Not only does the lack of a record hinder the court's, and the plaintiff's, ability to scrutinize the SLC's good faith, independence, and reasonableness, it also suggests that the SLC has not taken its obligation seriously and has not acted in good faith.

arguments asserted by Martha in opposition to the companies' motion.[35]

## IV.

For the reasons stated above, the defendants' motion to dismiss is DENIED. IT IS SO ORDERED.

---

35.  *See Electra*, 1999 WL 135239, at *5 & n. 8. Specifically, Martha argues that the SLC's remaining conclusions were unreasonable and were the result of an unreasonable investigation.