RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THE BOOTH FAMILY TRUST, Charles
Federman, Trustee, Derivatively on Behalf of
Nominal Defendant, Abercrombie & Fitch;
ALFRED FREED,

　　　　　　　　　*Plaintiffs-Appellants,*

　　　　*v.*

MICHAEL S. JEFFRIES; ROBERT S. SINGER;
RUSSELL M. GERTMENIAN; ARCHIE M.
GRIFFIN; JAMES B. BACHMANN; LAUREN J.
BRISKY; JOHN W. KESSLER; JOHN A.
GOLDEN; EDWARD F. LIMATO; SAMUEL N.
SHAHID, JR.; ALLAN A. TUTTLE, and
ABERCROMBIE & FITCH CO.,

　　　　　　　　　*Defendants - Appellees.*

> No. 09-3443

_____

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
Nos. 05-01084; 05-00998; 05-00964; 05-00819; 05-00860—Edmund A. Sargus, Jr.,
District Judge.

Argued: June 10, 2010

Decided and Filed: April 5, 2011

Before: MARTIN and GRIFFIN, Circuit Judges; DUGGAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Beth A. Keller, New York, New York, for Appellants. Philip A. Brown, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** Beth A. Keller, Jamie R. Mogil, New York, New York, Jacob A. Goldberg, FARUQI & FARUQI, LLP, Huntington Valley, Pennsylvania, for Appellants. Philip A. Brown, Alycia N. Broz, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellees.

_____

[*]The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

MARTIN, J., delivered the opinion of the court, in which DUGGAN, D. J., joined.  GRIFFIN, J. (pp. 19-23), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

BOYCE F. MARTIN, JR., Circuit Judge.  Plaintiffs-appellants are shareholders of Abercrombie & Fitch Co.  The Shareholders filed a derivative suit on behalf of Abercrombie against several officers and directors alleging that defendants caused Abercrombie to make misleading public statements between June 2 and August 18, 2005, which caused the stock price to rise and then fall once the falsity of these statements was revealed.[1]  An investigation by the Securities Exchange Commission and securities fraud lawsuits followed, which the Shareholders allege damaged Abercrombie.

Upon the filing of the lawsuit, Abercrombie invoked a procedural option available under Delaware law by forming a special litigation committee to investigate the claims made by the Shareholders.  The special litigation committee subsequently recommended that Abercrombie seek dismissal of the lawsuit, which Abercrombie did by filing a motion to dismiss.  The district court granted the motion, holding that Abercrombie's special litigation committee was independent under Delaware law, it conducted its investigation in good faith, and its decision not to pursue the derivative suit was reasonable.  However, we hold that there are serious questions as to Abercrombie's special litigation committee's independence, and therefore **REVERSE** the district court's decision, **DENY** the motion to dismiss, and **REMAND** for further proceedings.

---

[1] These allegations are also the core of a securities class action case against Abercrombie, *Ross, et al. v. Abercrombie & Fitch, Co., et al.* (No. 09-4028), that was argued the same day as this case.  The parties in *Ross* reached a settlement terminating that case before our Court issued a decision.

**I.**

The Shareholders generally allege that certain officers and directors caused Abercrombie to issue misleading public statements regarding the success of its business model in early 2005, which resulted in the stock price rising and then falling after the falsity of these statements was revealed later that year. Essentially, according to the complaint, Abercrombie adopted a business model of selling products with a low manufacturing cost at high retail prices, resulting in a high per-unit margin. The company sought to create such a desired brand that it could "train" its customers to not expect a sale or markdowns and instead just pay the high price. This approach manifested itself most particularly in Abercrombie's denim products, which were apparently made cheaply but sold expensively.

Beginning in early 2005 and continuing through the summer, Abercrombie issued reports indicating that its denim sales were strong and that its high gross margin business strategy was working. The Shareholders allege that these statements were misleading because company insiders knew that Abercrombie was amassing a large surplus of inventory such that there would have to be dramatic markdowns to clear out the inventory. The Shareholders further allege that the officers and directors knew that this corrective action would result in a decrease in per-unit profit and cast doubt on the viability of Abercrombie's business model, causing a negative correction in the company's stock price. The stock price eventually did fall, which kicked off a spate of lawsuits and regulatory investigations.

During this time, when the insiders are alleged to have known that the price would soon fall, five of the defendants—Singer, Jeffries, Bachmann, Kessler, and Griffin—sold a large number of their personally owned shares of Abercrombie stock. The Shareholders claim that this amounts to insider trading, and they level additional allegations against this group of defendants.

In response to this lawsuit, in October 2005, Abercrombie's Board of Directors formed a special litigation committee. The board resolution creating the special litigation committee called for it to have two members. Initially, Abercrombie's special

litigation committee was comprised of Daniel Brestle and Allan Tuttle, both members of Abercrombie's Board. Although Tuttle is now a defendant, he was not named when Abercrombie formed the special litigation committee. Brestle later resigned, but did so before the special litigation committee issued its report, and was replaced by Lauren Brisky. Brisky is also a Board member, and was a named defendant at the time of her appointment to the special litigation committee. The Board gave the special litigation committee complete authority to investigate the Shareholders' claims and to direct the company on whether to proceed with the lawsuit on its own behalf or to seek its dismissal as being against the interests of the company.

Abercrombie's special litigation committee retained the law firm of Cahill Gordon & Reindell LLP, a national law firm that had no prior relationship with Abercrombie. Cahill Gordon did the bulk of the work in interviewing witnesses and reviewing documents and records, advised the two special litigation committee members on the progress and results of the investigation, and made recommendations on how to proceed. Because of their prior relationship, Tuttle abstained from considering the claims against Singer. The record indicates that Tuttle did not attend the interview with Singer but does not otherwise explain how he was screened from considering the claims against Singer.

Approximately sixteen months after its formation, the special litigation committee produced a 144-page report detailing its investigation and concluding that there was no evidence to support the Shareholders' claims. The special litigation committee therefore directed Abercrombie to seek dismissal of the case. Abercrombie filed its motion to dismiss pursuant to Federal Rule of Civil Procedure 41(a)(2) on September 10, 2007 under the framework set out by the Delaware Supreme Court in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). Under *Zapata*, as explained more fully below, a corporation may appoint a special litigation committee to investigate claims presented in a derivative action. If a court finds that a corporation's special litigation committee was independent, conducted its investigation in good faith, had reasonable bases for its conclusion and the decision to dismiss the lawsuit is not

inconsistent with business judgment, the court will dismiss the derivative action. *Id.* at 788-89.

The Shareholders proceeded to take rather extensive discovery of Abercrombie's special litigation committee. On November 12, 2008, the Shareholders filed their opposition to the motion to dismiss, challenging the special litigation committee's conclusion that the suit should be dismissed. On March 12, 2009, the district court issued an opinion finding that Abercrombie's special litigation committee was independent, proceeded in good faith, and had reasonable bases for its conclusions. The district court declined to exercise its independent business judgment regarding the special litigation committee's recommendation, and therefore granted Abercrombie's motion to dismiss.

## II.

Neither the Delaware courts nor our sister circuits in cases applying Delaware law have clearly articulated the standard of review to be applied to a lower court's decision granting a motion to dismiss a derivative action based on the recommendation of a special litigation committee. This motion is a hybrid that does not have a clear analogue under the Federal Rules of Civil Procedure, but shares some characteristics of a motion to dismiss pursuant to Rule 12, and some characteristics of a motion for summary judgment under Rule 56. *See Zapata*, 430 A.2d at 787 (describing a special litigation committee's motion to dismiss as a hybrid between Delaware Court of Chancery Rules 12 and 56). When considering a motion to dismiss under Rule 12, we review the district court's decision de novo. *In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2010). Similarly, we review de novo a grant of summary judgment pursuant to Rule 56. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 311 (6th Cir. 2010).

For the purpose of determining the appropriate level of appellate scrutiny, the nature of a corporation's motion to dismiss pursuant to the recommendation of its special litigation committee is most similar to a summary judgment motion. As discussed below, the focus of the *Zapata* inquiry is not on the merits of the plaintiffs' claims, but

on whether maintenance of the suit would be in the company's best interest.  This inquiry is one step removed from the actual merits and allows a special litigation committee to recommend dismissal, consistent with its business judgment, even if a derivative suit may ultimately be successful.  *See Zapata*, 430 A.2d at 788 (noting that the decision to pursue a derivative suit "requires a balance of many factors ethical, commercial, promotional, public relations, employee relations, fiscal as well as legal" (internal quotation marks omitted)).   However, even though a special litigation committee motion does not go to the merits, it is similar to a summary judgment motion because the movant points to matters outside the pleadings, *i.e.* the special litigation committee's report, as providing the basis for relief.  The opposing party seeks to oppose with other evidence, if available, and the movant replies in support.  *Id.*  In describing the procedure, the Delaware Supreme Court noted that "the moving party should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law."  *Id.* Because the district court is only making legal conclusions about uncontroverted facts in considering the first prong of the *Zapata* inquiry, there is no reason for according deference to the district court's conclusions.

Moreover, the nature of the inquiry is similar to a summary judgment motion, in that the court is determining whether there is a question of material fact as to the relevant legal issue.[2]   Therefore, because a special litigation committee's motion to dismiss is analogous to what courts consider in deciding a summary judgment motion, which we

---

[2]Although (1) the *mechanics* of a *Zapata* motion and a summary judgment motion are analogous, and (2) the *inquiry* is analogous insofar as the court is determining whether a genuine question of material fact exists, it must be observed that the result of the two motions can be quite different.  The result is the same if the court agrees with the special litigation committee's position and if the court agrees with the summary judgment movant's position—dismissal with prejudice.  However, the results differ if the court rules against the movants.  If the court denies a summary judgment motion due to the existence of material questions of fact, the questions proceed to ultimate resolution by a factfinder.  However, if the court finds a genuine question as to a special litigation committee's independence, good faith, or reasonableness under *Zapata*, that is the end of the matter for purposes of the special litigation committee.  The court denies the *Zapata* motion and allows the shareholder plaintiffs' claims to proceed to their merits.  The questions of independence, good faith, or reasonableness are not resolved at some later point in the litigation.  Thus, in this sense, the results of the two motions are not analogous.  However, that the result may differ does not outweigh the fact that both the mechanics of the motion and the nature of the inquiry are analogous.

review de novo, we hold that a district court's determination of whether a special litigation committee's motion to dismiss should be granted is properly reviewed de novo.

Although this Court has not addressed this issue under Delaware law, we have previously held that a district court's determination regarding a special litigation committee's motion to dismiss brought under Massachusetts law is reviewed de novo. *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 374 (6th Cir. 1984). Although the motion at issue in *Hasan* was brought as a summary judgment motion, we considered the origins of shareholder derivative suits before determining that, consistent with the typical summary judgment standard, we would review the district court's determination de novo. *Id.* Massachusetts has since rejected the *Zapata* approach, Mass. Gen. Laws ch. 156D, § 7.44, cmt. 2 (West 2010), but nothing in our opinion in *Hasan* relied on any unique facets of Massachusetts law in determining the appropriate standard of review, *see Hasan*, 729 F.2d at 374. Therefore, because *Hasan* does not cabin itself to special litigation committee motions under Massachusetts law, or to special litigation committee motions explicitly brought under Rule 56, it further supports reviewing de novo the district court's decision in this case.

Additionally, consistent with the *Erie* doctrine, federal law governs the standard of review of a summary judgment motion in a diversity case. *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165-66 (6th Cir. 1993); *but see K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996) (holding that state law provides the standard of review for a denial of a Rule 50 motion in a diversity case). Because reviewing a summary judgment motion is not like a Rule 50 motion, which is interlaced with the proper distribution of issues between judges and juries, we do not believe it is necessary to make such an exception here. Accordingly, under federal law and in accordance with our decision in *Hasan*, we will review de novo the district court's decision to grant a corporation's motion to dismiss pursuant to the recommendation of its special litigation committee.

While the standard of review is governed by federal law, we do not believe that a different result would occur under Delaware law. The Delaware Supreme Court's

analogy between a special litigation committee's motion to dismiss and dismissal pursuant to Rule 41 helps justify the rationale behind the *Zapata* framework, but it is not persuasive in determining the standard of review to be applied to a district court's ruling on such a motion. In developing the *Zapata* framework, the Delaware Supreme Court noted that a special litigation committee's motion to dismiss is also analogous to situations where the plaintiff seeks dismissal after an answer pursuant to Delaware Court of Chancery Rule 41(a)(2). *Zapata*, 430 A.2d at 788. This dismissal, like a motion to dismiss filed by a corporation based on the recommendation of its special litigation committee, requires court approval. Del. Ch. Ct. R. 41(a)(2). The *Zapata* court stated that "[w]hether the Court of Chancery will be persuaded by the exercise of a committee power resulting in a summary motion for dismissal of a derivative action, where a demand has not been initially made, should rest, in our judgment, in the independent discretion of the Court of Chancery." *Zapata*, 430 A.2d at 788. Although the language in *Zapata* could be read to imply that we should apply a more deferential standard of review to a district court's determination on whether the motion to dismiss should be granted, we believe that this passage merely reflects the Delaware Supreme Court's concern that courts not blindly follow special litigation committees' recommendations, which, as elaborated on below, are given great power to control the outcome of derivative suits with very few external checks.

Abercrombie cannot alter the standard of review by styling its motion as a motion to dismiss under Rule 41(a)(2). We review motions under Federal Rule of Civil Procedure 41(a)(2) for abuse of discretion. *E.g.*, *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 730 (6th Cir. 2004). While Abercrombie's motion states that it is moving pursuant to Rule 41(a)(2), as described above, for the purpose of determining the appropriate level of appellate review, we believe that it is more similar to a summary judgment motion. Therefore, de novo review is appropriate for a motion to dismiss based on the *Zapata* framework even though Abercrombie filed this motion pursuant to Rule 41(a)(2).

Although it is not at issue in this case, as the district court declined to exercise its independent business judgment as permitted by the second prong of the *Zapata* inquiry, we leave open the possibility that a decision under that prong may be better reviewed under a more deferential standard. However, we will review de novo the district court's decisions under the first prong of the *Zapata* inquiry as to whether the special litigation committee was independent, carried out the investigation in good faith, and had reasonable bases supporting its conclusions.

### III.

Abercrombie is a Delaware corporation and therefore Delaware law governs the substantive issues of this action. *See Brown v. Ferro Corp.*, 763 F.2d 798, 803 (6th Cir. 1985). The Delaware Supreme Court established a unique procedure for determining whether a special litigation committee's motion to dismiss a shareholder derivative action should be granted. Under this procedure, "[f]irst, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions." *Zapata*, 430 A.2d at 788. The corporation has the burden of proving that its special litigation committee was independent, carried out its investigation in good faith, and reached a reasonable conclusion. *Id.* If the court has doubts about the committee's independence or whether it has shown reasonable bases for its conclusions, the court shall deny the corporation's motion. *Id.* at 789.

If a court is satisfied with the committee's conduct under the first step, the court may apply its own independent business judgment, and determine whether the motion should be granted. *Id.* "This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied." *Id.*

Subject to the court's independent business judgment, this procedure grants a properly formed special litigation committee a tremendous amount of leeway to decide whether a derivative action should be maintained. Maintaining a derivative action can implicate many complex, non-legal concerns. This procedure endeavors to give courts a means to supervise corporations such that they cannot use the special litigation

committee procedure to "consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs," and plaintiffs cannot incapacitate corporations with "meritless or harmful litigation." *Id.* at 787. Therefore, one of the primary concerns becomes whether Abercrombie's special litigation committee was independent.

### A.    *Zapata* Independence

Under Delaware law, "[t]he question of independence 'turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind.' That is, the independence test ultimately 'focus[es] on impartiality and objectivity.'" *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 920 (Del. Ch. 2003) (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del Ch. 2001)). The special litigation committee bears the burden of proving that there is no material issue of fact as to its independence. *Id.* If the facts combine to give rise to a perception of an inability to proceed independently, the shareholder need not show that the committee was in fact not independent. *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985) ("[P]otential conflicts of interest or divided loyalties, when considered as a whole, raise a question of fact as to whether [the special litigation committee] could act independently."). We need not conclude that any committee member "actually acted improperly" in order to conclude that the moving party failed to meet its burden of showing the absence of any possible issue of material fact regarding the special litigation committee's independence. *See id.*

Thus, a finding of lack of independence in the special litigation committee context is not a finding that its members "are not persons of good faith and moral probity, it is solely to conclude that they were not situated to act with the required degree of impartiality." *Oracle*, 824 A.2d at 947. Concluding that a committee member is not independent merely recognizes that his or her connection to the alleged wrongdoers or the alleged wrongdoing "would be on the mind of the [special litigation committee] member[] in a way that generates an unacceptable risk of bias." *Id.*

In considering the makeup of a special litigation committee, we look to see if the facts create a "reasonable doubt" as to the committee's impartiality. *E.g.*, *id.* If a

reasonable doubt exists as to the special litigation committee's independence, the special litigation committee's conclusions are rejected then and there; no further resolution is required on the independence question.[3] The case then proceeds to the merits of the claims against the defendants.

A corporation forms a special litigation committee after being presented with either a demand from shareholders, or, in cases where demand may be excused, a lawsuit. In either case, the corporation is fully aware of the charges that the special litigation committee will be tasked with investigating before it forms the committee. Delaware law does not impose any restrictions on the number of members a special litigation committee must have or which board members must be on the committee. *See, e.g.*, *Sutherland v. Sutherland*, 958 A.2d 235, 240 (Del. Ch. 2008) (finding one-person committee was independent). Consequently, in a special litigation committee case, there is no presumption of independence and the special litigation committee bears the burden of "establishing its own independence by a yardstick that must be 'like Caesar's wife'—'above reproach.'" *Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004) (quoting *Lewis*, 502 A.2d at 967). Because the corporation has every opportunity to form a perfectly independent special litigation committee, we require that it do so.

**B.        Independence of Special Litigation Committee Member Tuttle**

Tuttle's decision to recuse himself from considering the allegations against Singer, a named defendant and a central player in the Shareholders' allegations, demonstrates that Tuttle, and therefore the special litigation committee, was not independent. At the time of the events in question, Singer was Abercrombie's Chief Operating Officer and appears to have been involved heavily in the strategy of touting the success of Abercrombie's business model to the market. He is also one of the

---

[3]The Delaware courts sometimes frame the relevant question as being whether the record creates a "genuine question of material fact" as to the committee's independence. *E.g.*, *Oracle*, 824 A.2d at 920. However, as noted above, unlike a summary judgment motion, if there is a material question of fact as to the special litigation committee's independence, that issue will not later be resolved by a factfinder. Therefore, we do not find it helpful to think of the question as being whether a material factual dispute exists as to the special litigation committee's independence because the result of such a determination is that the dispute will never be resolved.

defendants alleged to have engaged in insider trading while the stock price was allegedly artificially high. Singer had previously been associated with the Gucci Company, where he worked with Tuttle. Singer spearheaded the effort to have Tuttle join the Abercrombie board, and he described Tuttle as "my close personal friend who worked with me at Gucci who I brought to the board." Discovery also revealed that Tuttle was planning a trip to Italy to visit Singer and his wife.

We note at the outset that other areas of Delaware corporate law are relatively flexible and will not find that directors are incapable of exercising independent judgment even if they are friends, and have personal relationships with a board member allegedly responsible for some wrongdoing. *See, e.g.*, *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051-52 (Del. 2004). This is understandable in light of how business is conducted and board positions are filled. However, when considering a special litigation committee's independence, which, unlike a board, can be crafted to be perfectly independent with respect to its charge, it is unclear if Delaware law would be quite as accepting.

In any event, we need not determine precisely where Delaware draws the line between permissible and impermissible relationships in order to resolve this case. Had Tuttle not recused himself from considering the claims against Singer, we might agree with the district court's conclusion that he was independent. However, because Tuttle, for whatever reason or no reason at all, recused himself from considering the claims against Singer he effectively admitted that he was not independent. At the very least, his recusal creates a perception that Tuttle was not independent. Even if Tuttle's relationship with Singer was not so close that it would get caught by the net established in Delaware case law, he cannot now use that to show his independence. When Tuttle recused himself from considering the claims against Singer, he essentially launched a signal flare that he was not independent.[4]

---

[4] The dissent argues that Tuttle's friendship with Singer is insufficient to show his lack of independence and that Tuttle's decision to recuse himself from considering the claims against Singer does not demonstrate bias. (Dis. Op. p. 20.). We agree with the dissent that a recusal is not always an admission of bias. Rather, each case must be judged on its own facts and circumstances. Here, Tuttle's decision to recuse himself, with the advice of counsel advising the special litigation committee, casts

This is not to say that Tuttle is a bad person or did anything wrong. Quite to the contrary, Tuttle appears to have attempted to discharge his duties in good faith by taking action which he believed would preserve his independence with respect to the other members. However, because of Singer's relationship to the other members and implication in the alleged wrongdoing due to his position as Abercrombie's President, Chief Operating Officer and Chief Financial Officer, the recusal was not effective.

Abercrombie has not met its burden of showing that Tuttle was able to independently consider the claims against the other directors because in the context of the misleading statement claims, Tuttle's purported abstention from considering claims against Singer was mere formalism. The claims were, generally, that the Board endorsed the issuing of misleading statements as to Abercrombie's profitability. These claims are not individual in nature, and a conclusion that one director engaged in wrongdoing would imply that the other directors did as well. Furthermore, as the Shareholders point out, Singer is alleged to have been at the very center of the allegedly improper activity. Therefore, if Tuttle, as a member of Abercrombie's special litigation committee, had concluded that the claims against *any* of the directors regarding the public statements were meritorious, he would necessarily be concluding that the claims against Singer had merit, even if he did not say so explicitly. Stated differently, Tuttle could not explicitly conclude that any claim against any other defendant had merit without implicitly concluding that the claims against Singer also had merit. It follows, then, that if Tuttle's relationship with Singer was sufficiently close to make him question his ability to pass judgment on Singer, that same relationship would necessarily infect his judgment regarding other defendants. Even if Abercrombie could theoretically establish that Tuttle came to his conclusions regarding the other directors free of any taint caused by his relationship with Singer, the mere appearance of the special litigation committee's

serious doubts on his ability to make an independent judgment as to the allegations against Singer.

Additionally, as the dissent notes, there is very little case law to guide us on this issue and nothing from the Delaware courts in the unique context of special litigation committees. Because special litigation committees wield tremendous power and the only real check on their conclusions is whether their members were independent, it is not clear that Delaware would approve of a committee member's decision to recuse himself or herself from considering claims against a particular director.

lack of independence is enough to deny Abercrombie's motion based on the special litigation committee's recommendation and allow the derivative suit to proceed.

Moreover, Abercrombie did not establish that Tuttle effectively recused himself from considering the claims against Singer. While we do not hold that a recusal can preserve a special litigation committee member's independence, the record in this case does not suggest that Tuttle's recusal was effective. The burden is on Abercrombie to show that its special litigation committee was independent. *See Oracle*, 824 A.2d at 920. The extent of Tuttle's recusal appears to have been not attending Singer's interview. None of the affidavits in support of this motion detail the steps the special litigation committee took to keep Tuttle removed from considering the claims against Singer, and Abercrombie did not even establish that Tuttle was screened from considering the parts of the report discussing Singer's involvement. Therefore, the record does not indicate that Abercrombie met its burden of establishing the special litigation committee's independence.

Even if we were to accept the premise that Tuttle's decision to abstain from considering claims against Singer preserved Tuttle's independence with respect to the other defendants—a premise that Abercrombie does not identify support for in any decisions applying Delaware law—the decision to abstain materially altered the special litigation committee as an entity. The Board created a special litigation committee composed of two members to investigate the claims. Tuttle's decision to abstain as to Singer resulted in a committee of one. Abercrombie points to several decisions that indicate that a one-member special litigation committee is not necessarily problematic, and we agree. However, the problem is not that the special litigation committee only had one member as to Singer. The problem is that the special litigation committee only had one member when the resolution that created it called for a two-member committee. If Abercrombie had wanted a special litigation committee with just one member, it could have so chosen. But, instead, it appointed two members, and we assume that Abercrombie saw some value in having two members.

Furthermore, it is not clear from the record that the special litigation committee was even authorized to operate with only one member. The Board's resolution forming the special litigation committee is silent on this point,[5] so it is quite possible that the committee was acting *ultra vires* when it considered the claims against Singer with less than its full complement of members. As special litigation committees derive their power and legitimacy from the board resolutions that create them, any action that runs contrary to the resolution casts doubt on the legitimacy of an special litigation committee's conclusions. Though this point also potentially bears upon the good faith of Abercrombie's special litigation committee and the reasonableness of its conclusions, the problem was born by Tuttle's lack of independence as to Singer, so it seems proper to treat it as an independence issue.

While Tuttle is now a named defendant, it does not appear that Tuttle was named as a defendant at the time that Abercrombie formed its special litigation committee. Furthermore, there is reason to doubt the strength of the claim against him—he became a director only three months prior to the derivative suit being filed and long after the events that are the focus of the Shareholders' claims. Therefore, it seems that he is a defendant solely because he happens to be on the Board. While his current status as a named defendant does not necessarily demonstrate his lack of independence, Tuttle's decision to recuse himself from considering claims against Singer, combined with Singer's central role in the alleged wrongdoing, leave us with serious doubts as to his independence.

## C.    Independence of Special Litigation Committee Member Brisky

The other member on Abercrombie's special litigation committee with Tuttle, Brisky, is the Vice Chancellor for Administration and Chief Financial Officer of Vanderbilt University. She was also a member of the Board and, specifically, a member

---

[5]The resolution does state that in the event the special litigation committee concludes it needs more authority or power, it should so request from the Board. However, there is no indication that the special litigation committee ever asked the Board for the authority to proceed with only one member.

of its Audit Committee.  Brisky was not originally a member of the special litigation committee, but she replaced Brestle after he resigned.

The Shareholders do not claim that Brisky is particularly beholden to any of the other members of the Board.  Instead, they point out that (1) Brisky was a named defendant, and thus theoretically facing liability, and (2) that as a member of the Audit Committee she played a role in the actions being challenged.  While both of these factors arguably cast some doubt on her ability to independently consider the Shareholders' claims against the directors, we need not analyze her conduct in detail because it is heavily dependent on Delaware law and unnecessary in light of Tuttle's taint on the special litigation committee.

**D.    Was the SLC Independent?**

Although *Zapata* allows courts to use their business judgment and independently determine whether the special litigation committee's motion to dismiss is actually in the best interests of the corporation, courts put the most weight on *Zapata's* first prong and, specifically, whether the committee was independent.  *See Oracle*, 824 A.2d at 940 (describing the "moral gravity . . . and social pressures" on special litigation committee members and noting that for this reason, "the independence inquiry is critically important").  In accordance with this, Delaware courts hold special litigation committees to a very high standard of independence.  Special litigation committees are not presumed to be independent, and the special litigation committee must prove its independence "beyond reproach."  *See Beam*, 845 A.2d at 1055; *Lewis*, 502 A.2d at 967.  In light of Tuttle's recusal, we are left with strong doubts as to the special litigation committee's independence and cannot conclude that Abercrombie has clearly demonstrated its special litigation committee's independence.

While the allegations of Brisky's lack of independence may not, standing alone, compel a finding of lack of independence, we cannot conclude that the special litigation committee was independent in light of Tuttle's recusal.  We look not only to the fact of objectivity and validity when reviewing special litigation committee determinations, but also the appearance of objectivity and validity.  "The composition and conduct of a

special litigation committee therefore must be such as to instill confidence in the judiciary and, as important, the stockholders of the company that the committee can act with integrity and objectivity." *Biondi v. Scrushy*, 820 A.2d 1148, 1156, 1166 (Del. Ch. 2003). Tuttle's decision to recuse himself from considering claims against Singer, and Singer's central role in the alleged wrongdoing, casts serious doubt on Tuttle's objectivity as to the claims as a whole and does not instill confidence in us. While not dispositive, Brisky's status as a named defendant adds to the doubt regarding this special litigation committee's independence. Particularly where Abercrombie had the opportunity to work with competent counsel and cherry pick who would serve on its special litigation committee, it cannot now rely on the recommendation of a special litigation committee with such dubious independence.

This is one of those rare situations where Abercrombie had every opportunity to create an independent special litigation committee but nonetheless failed to do so. Delaware law gives an independent special litigation committee extremely wide latitude to conclude that a derivative suit is not in the best interests of the corporation, but the committee must be independent. In light of the tremendous discretion and power that special litigation committees are afforded under the *Zapata* procedure, it is not unreasonable to require that corporations comply with the protocols set out by the Delaware Supreme Court and staff their special litigation committees with individuals who can exercise independent judgment.

Because we conclude that there are serious doubts as to Abercrombie's special litigation committee's independence, we need not consider whether the committee carried out its investigation in good faith or whether its conclusions are reasonable. Without a demonstration that its special litigation committee was independent, Abercrombie's motion to dismiss based on the committee's recommendation cannot be granted.

**IV.**

Abercrombie contends that this lawsuit is a classic example of a strike suit and, because we are not considering the merits of the suit at this time, that may very well be the case. However, at this stage, because Abercrombie failed to adequately demonstrate its special litigation committee's independence, we cannot dismiss the suit based on its recommendation. Therefore, we **REVERSE** the decision of the district court, **DENY** the motion to dismiss this action, and **REMAND** for further proceedings.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.  In reversing the district court, the majority holds that the Special Litigation Committee ("SLC") lacked independence because "serious doubts" regarding its independence arise based upon committee member Alan Tuttle's partial recusal as to the claims against defendant Robert Singer.  According to the majority:

> Had Tuttle not recused himself from considering the claims against Singer, we might agree with the district court's conclusion that he was independent. However, because Tuttle, for whatever reason or no reason at all, recused himself from considering the claims against Singer he effectively admitted that he was not independent.

From this inference, the majority holds that the SLC lacked independence regarding the claims against the corporation and other directors and officers: "Tuttle's decision to recuse himself from considering the allegations against Singer, a named defendant and a central player in the Shareholders' allegations, demonstrates that Tuttle, and therefore the special litigation committee, was not independent."

The majority fails to cite any authority for its holding and, because its conclusion is inconsistent with Delaware law, I respectfully dissent.

I.

Delaware law controls the substantive issues in this matter.[1]  *Brown v. Ferro Corp.*, 763 F.2d 798, 803 (6th Cir. 1985).  In holding that the SLC did not meet its burden in establishing its independence, the majority relies almost exclusively on Tuttle's partial recusal, asserting that it constitutes an admission of bias.  I respectfully disagree.

---

[1]I agree with the majority that de novo review is appropriate.

In my view, Tuttle's partial recusal regarding Singer does not impute bias to the SLC. As the Supreme Court of Delaware has noted, "it is the care, attention and sense of individual responsibility to the performance of one's duties that touch on independence." *Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del. 1985). This is exactly what Tuttle demonstrated here. Indeed, through his partial recusal, Tuttle attempted to expel any doubt regarding the independence of the SLC.

Upon detailed review, I have found only one case directly addressing whether a recusal may serve as an admission of bias. In *Buchwald v. University of Minnesota*, 573 N.W.2d 723 (Minn. Ct. App. 1998), the president of the University of Minnesota recused himself from making a determination regarding a professor's alleged misconduct. *Id.* at 725. Later, when the professor sought indemnification for the costs in defending against the allegations, the president denied the request. *Id.* In challenging this denial, the professor asserted that the president's recusal admitted his bias against the professor. *Id.* at 727-28. The Minnesota Court of Appeals disagreed, holding that a recusal does not, in and of itself, admit bias. *Id.* at 728.

While it is the SLC's ultimate burden of persuasion to establish its independence, *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788 (Del. 1981), it is the plaintiff who must demonstrate *how* the facts presented rise to the level necessary to demonstrate a lack of independence. *See Kaplan*, 499 A.2d at 1189 ("[Plaintiff] . . . fails to show how any of these factors were such an influence on . . . the [SLC] that they prevented them from basing their decisions on the corporate merits of the issues.").

Significantly, had Tuttle not recused himself and fully addressed all issues presented to the SLC, there would be little doubt regarding the committee's independence. In my view, Tuttle's partial recusal does not alter this result.

"The question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind." *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 920 (Del. Ch. 2003) (internal quotation marks and citation omitted; emphasis in original). Delaware courts have consistently held that "[n]either mere personal friendship alone, nor mere outside

business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence." *Litt v. Wycoff*, No. Civ. A. 19083-NC, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003) (unpublished) (footnotes omitted); *see also Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.").[2]  Indeed, "business dealings seldom take place between complete strangers and it would be a strained and artificial rule which required a director to be unacquainted or uninvolved with fellow directors in order to be regarded as independent." *Sutherland v. Sutherland*, 958 A.2d 235, 241 (Del. Ch. 2008) (citation and footnote omitted).  Accordingly, Tuttle's friendship with Singer is not a "substantial reason" indicating that he was incapable of making decisions in the best interests of the corporation.

## II.

Without directly resolving the question of Lauren Brisky's independence, the majority notes that her status as a named defendant and as a member of the Audit Committee "cast some doubt on her ability to independently consider the Shareholders' claims against the directors[.]"  Again, I disagree.

Status as a defendant, in and of itself, does not disqualify a person from serving on an SLC.  *See Kindt v. Lund*, No. Civ. A. 17751, 2003 WL 21453879, at *3 (Del. Ch. May 30, 2003) (unpublished) (holding that an SLC member's status as a defendant does not create a lack of independence); *Katell v. Morgan Stanley Group, Inc.*, Civ. A. No. 12343, 1995 WL 376952, at *7 (Del. Ch. June 15, 1995) (unpublished) (same). Moreover, Brisky's Audit Committee membership does not demonstrate a lack of independence.  First, there is no evidence that Brisky, while serving on the Audit

---

[2]The issue of independence is relevant not only in the SLC context, but also in the context of demand futility.  *See Kaplan*, 499 A.2d at 1189 n.1.  While the burden of proof applicable to the issue of demand futility is different from that required under *Zapata*, Delaware courts consistently look to demand futility cases in addressing the issue of SLC independence.  *See id.* at 1189 (relying substantially on demand futility authority in addressing the independence of an SLC); *London v. Tyrrell*, Civ. Action No. 3321, 2010 WL 877528, at *12 (Del. Ch. Mar. 11, 2010) (unpublished) ("The independence inquiry under the *Zapata* standard has often been informed by case law addressing independence in the pre-suit demand context and vice-versa.") (citing cases).

Committee, actually reviewed any of the releases relevant to the current lawsuit. Moreover, even if Brisky had approved the releases at issue, such approval would not destroy her independence. *See Kaplan*, 499 A.2d at 1189 ("Even a director's approval of the transaction in question does not establish a lack of independence."). Accordingly, the SLC has met its burden in establishing the independence of Brisky.

### III.

Finally, the majority intimates that the SLC may have acted without authority because Tuttle's partial recusal created a one-member SLC. Once again, this assertion is inconsistent with Delaware law and unsupported by any authority. Indeed, Delaware expressly authorizes committees containing one member. 8 Del. C. § 141(c); *see also Sutherland*, 958 A.2d at 240.

Moreover, the doctrine of *ultra vires* is not applicable. *See Black's Law Dictionary* 730 (2d pocket ed. 2001) (defining "ultra vires" as "Unauthorized; beyond the scope of power allowed or granted by a corporate charter or by law"). While the Abercrombie board created an SLC with two members, the majority cites no bylaws or other corporate documents requiring that the members act jointly on all committee business, nor does the majority point to any corporate restrictions forbidding partial recusals. *See cf. St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, No. 06 Civ. 688, 2008 WL 2941174, at *6 (S.D.N.Y. July 30, 2008) (unpublished) ("The Court finds no occasion or authority to specify further the particular roles individual committee members must play in order for the committee to be treated as a multimember entity."). There simply is no basis in the record to hold that the SLC acted *ultra vires* and therefore lacked independence.

### IV.

In sum, I disagree with the majority's holding that the SLC failed to meet its burden of establishing its independence. Tuttle's partial recusal is not an admission of bias imputed to the SLC.

Because the majority holds that the SLC did not meet its burden in establishing independence, it does address the second and third prongs of the *Zapata* analysis. 430 S.2d at 788-89.  For the reasons well-stated by the district court, I would hold that the SLC also met its burdens of establishing its good faith and an adequate basis for its conclusions. *In re Abercrombie & Fitch Co. Derivative Litig.*, No. 2:05-cv-00819, slip op. at 11-18 (E.D. Mich. Mar. 12, 2009) (unpublished).

Accordingly, I respectfully dissent.  I would affirm the order of the district court granting defendants' motion to dismiss.