# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CARVANA CO. STOCKHOLDERS LITIGATION | ) ) | CONSOLIDATED C.A. No. 2020-0415-KSJM |

## MEMORANDUM OPINION

Submitted: December 18, 2023
Decided: March 27, 2024

Christine M. Mackintosh, Rebecca A. Musarra, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Kimberly A. Evans, Robert Erikson, Irene R. Lax, BLOCK & LEVITON LLP, Wilmington, Delaware; Jason M. Leviton, Amanda R. Crawford, BLOCK & LEVITON LLP, Boston, Massachusetts; Ned Weinberger, Mark Richardson, Jiahui (Rose) Wang, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Domenico Minerva, John Vielandi, LABATON KELLER SUCHAROW LLP, New York, New York; *Counsel for Plaintiffs Anthony Franchi, Construction Industry and Laborers Joint Pension Trust for Southern Nevada, St. Paul Electrical Construction Pension Plan, St. Paul Electrical Construction Workers Supplemental Pension Plan (2014 Restatement), and Retirement Medical Funding Plan for the St. Paul Electrical Workers.*

Joseph R. Slights III, Brad D. Sorrels, Shannon E. German, Leah E. León, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; *Counsel for the Special Litigation Committee of the Board of Directors of Carvana Co.*

David E. Ross, Adam D. Gold, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Brian M. Lutz, GIBSON, DUNN & CRUTCHER LLP, San Francisco, California; Colin B. Davis, Katie Beaudin, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; *Counsel for Nominal Defendant Carvana Co.*

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; *Counsel for Defendants Ernest Garcia III and Ernest Garcia II.*

**McCORMICK, C.**

This case arises from a direct offering made by Carvana Co. ("Carvana" or the "Company") in late March 2020. Controlling stockholders Ernest Garcia II and Ernest Garcia III (the "Garcias") participated in the direct offering. Later in 2020, Garcia II sold over $1 billion of his Carvana shares. The plaintiff-stockholders assert derivative claims against the Garcias for breach of fiduciary duty, alleging that the Garcias enriched themselves through the offering by acquiring shares at a depressed price.

After the court denied the defendants' motions to dismiss, the Company formed a two-person special litigation committee (the "SLC"). The SLC conducted a seven-month investigation, reviewing over 100,000 documents and interviewing many witnesses with assistance from advisors. The SLC concluded, in a 170-page report, that no wrongdoing occurred and that terminating the action was in Carvana's best interest. The SLC then moved to dismiss the lawsuit.

This court evaluates a special litigation committee's motion to dismiss under *Zapata Corporation v. Maldonado*.[1] Under *Zapata*, a special litigation committee has the burden to show its independence and that it undertook, in good faith, an investigation of reasonable scope that yielded reasonable bases supporting its conclusions. The court then applies its own business judgment to determine whether dismissal is in the best interests of the corporation. This decision finds that the SLC has met its burden under *Zapata* and grants the motion to dismiss.

---

[1] 430 A.2d 779 (Del. 1981).

## I.     FACTUAL BACKGROUND

The court draws the facts from the record submitted by the SLC and the plaintiffs ("Plaintiffs"), which includes the SLC report (the "SLC Report"), the 115 exhibits attached to the SLC Report, and the transcripts of the depositions of the two SLC members and a representative of its financial advisor, Houlihan Lokey, Inc.[2]

### A.     Carvana

Carvana is a Delaware corporation that sells used cars. "[F]amous for its multistory car vending machines," Carvana runs an e-commerce platform, Carvana Group LLC, that facilitates the sale of cars across the United States.[3] Carvana also offers financing services and connects buyers with insurance providers.[4] Carvana is the senior corporate entity in the "Up-C" structure between Carvana and Carvana Group LLC.[5]

Garcia II and Garcia III are Carvana's controlling stockholders.[6] Garcia III co-founded the company in 2012 and is its CEO, President, and Board Chairman.[7] Carvana went public through an IPO in 2017.[8]

---

[2] *See* C.A. No. 2020-0415-KSJM, Docket ("Dkt.") 122, Ex. A ("SLC Report"); Dkt. 132, Ex. A ("Maroone Dep. Tr."); Dkt. 132, Ex. B ("Parikh Dep. Tr."); Dkt. 132, Ex. C ("Taylor Dep. Tr.").

[3] SLC Report at 38.

[4] *Id.*

[5] *Id.* at 40.

[6] *Id.* at 1.

[7] *Id.* at 29.

[8] *Id.*

Carvana experienced growth until the COVID-19 pandemic (the "Pandemic").[9] In response to the Pandemic, Carvana began cutting costs and laying off employees.[10] Its stock price suffered.[11] The Company also "beg[an] to consider potential capital-raising opportunities."[12]

## B.    The Direct Offering

On March 15, 2020, representatives of Greenoaks Capital Partners, LLC ("Greenoaks"), a potential new investor, reached out to Garcia III to discuss acquiring $300 to $500 million of Carvana preferred stock.[13] The Company engaged in conversations with Greenoaks and existing investors.[14] Mike Levin (the Company's investor relations lead) contacted "many of Carvana's largest investors" at the time.[15] Lone Pine Capital LLC also expressed interest in an equity raise.[16] The Company had $300 million of debt capacity, so it also considered debt financing.[17] "Citi and

---

[9] *Id.* at 43–47.

[10] *Id.* at 55–56.

[11] *Id.* at 5. Carvana's stock price "dropp[ed] more than 20% from an opening price of $83.37 on the morning of Monday, March 2, to a closing price of $66.02 on the afternoon of Friday, March 6." *Id.*

[12] *Id.* at 53.

[13] *Id.* at 56–57.

[14] *Id.* at 56–58.

[15] *Id.* at 57.

[16] *Id.* at 60.

[17] *Id.* at 58.

Goldman pitched potential structured financing deals[,]" to which the Company did not respond.[18]

As the Company explored financing options, Carvana's operational performance worsened, and its access to capital contracted.[19] The Company's stock closed at $29.35 on March 20, 2020—40% down from the week prior.[20]

On March 24, 2020, the Carvana Board of Directors (the "Board") met to discuss a potential deal with Greenoaks. The proposed deal, at that point, consisted of a convertible preferred stock transaction priced between $45 and $50 per share, with a coupon of 8.5% to 9%.[21] After the meeting, Garcia III told Greenoaks that he hoped to "[g]et terms finalized ASAP (tonight)."[22]

The Board met again on March 25 to discuss the Greenoaks deal and potential alternatives,[23] such as an underwritten public offering or a pro-rata public offering to existing stockholders.[24] The Board determined that neither alternative was a viable option given time constraints.[25] The Board also discussed a stock offering to its largest stockholders.[26]

---

[18] *Id.* at 60.

[19] *Id.* at 60–63.

[20] *Id.* at 63.

[21] *Id.* at 67.

[22] *Id.* at 67–68.

[23] *Id.* at 69.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 70.

Although negotiations with Greenoaks progressed, the Board harbored concerns that the deal would not close fast enough, and so the Board shifted its focus to a direct offering (the "Direct Offering"). On March 26, Mark Jenkins (Carvana's CFO) presented the Board with a list of 24 investors that management identified as targets for the Direct Offering.[27] After the meeting, management engaged in conversations with the targeted investors.[28]

Multiple investors entered NDAs and expressed interest in the deal.[29] Given this interest, the Board convened and "authorized management to sell up to $600 million in common stock with the stock priced between $35 to $55 per share[.]"[30] It also "agreed that the Garcias would participate in the deal, likely contributing $50 million but in any event limiting their contribution to $75 million at most."[31]

Management then engaged in price negotiations with the targeted investors. T. Rowe Price Group, Inc. became the anchor investor[32] and heavily influenced the price of the Direct Offering.[33] Initially, Carvana sought $50 per share relative to the $56.55 trading price at the close of market on Thursday, March 26, but T. Rowe Price

---

[27] *Id.* at 76.

[28] *Id.* at 79.

[29] *Id.* at 79–80.

[30] *Id.* at 80.

[31] *Id.* at 81.

[32] *Id.* at 80–83.

[33] *Id.* at 83.

offered $43.50, with an explicit goal of not exceeding $45 per share.[34] Garcia III pushed for $46 per share, but T. Rowe Price held firm.[35]

T. Rowe Price confirmed later that day, on March 26, that it would agree to a price of $45 per share.[36] Tiger Global Management, LLC also agreed to participate in the deal at $45 per share.[37] At the time, Tiger Global thought that the Direct Offering—which would raise, by their estimate, at least $700 million—would allow Carvana to survive the Pandemic and beyond.[38]

On Friday, March 27, a subset of the Carvana directors met with management.[39] Management informed them that the investors had agreed to contribute to a capital raise that totaled $800 to $900 million at a price of $45 per share.[40] They decided, however, to limit the Direct Offering to $600 million at $45 per share,[41] which represented "an 8.2% discount to the stock's unaffected trading price."[42] The Garcias agreed to contribute $50 million.

---

[34] *Id.*

[35] *Id.*

[36] *Id.* at 83–84.

[37] *Id.* at 84.

[38] *Id.* at 84–85.

[39] *Id.* at 85.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 1.

Carvana announced the Direct Offering on March 30, 2020.[43] It was oversubscribed. The Garcias' allocation remained at $50 million, despite the oversubscription, because "management had committed to investors that the Garcias would contribute $50 million."[44] Carvana's CFO attributed this to "the Company [wanting] to avoid backing away from this commitment for fear that it would be viewed as a re-trade."[45] The market responded positively to the announcement.[46] Carvana's stock price closed at $52.38 on March 30.[47]

The Company then "complete[d] a public offering of Class A Common Stock at a price of more than $92 per share, for a total of almost $500 million" on May 18, 2020.[48] The price of Carvana stock climbed during the ensuing months.[49] Carvana's efforts yielded approximately $1 billion in total liquidity.[50] By the end of 2020, Carvana's stock price closed at $239.54.[51]

Section 16(b) of the Securities Exchange Act restricted the Garcias from realizing profits from their shares purchased through the Direct Offering until

---

[43] *Id.* at 89.

[44] *Id.* at 88.

[45] *Id.*

[46] *Id.* at 89.

[47] *Id.*

[48] *Id.* at 5.

[49] *Id.* at 92.

[50] *Id.* at 91.

[51] *Id.* at 93.

September 30, 2020.[52] Garcia II entered a Rule 10b5-1 Trading Plan on June 15, 2020.[53] "Between October 30, 2020, and December 31, 2020, Garcia II sold 5,567,979 shares of Class A Common Stock for a total of $1,239,333,468.02."[54] Garcia III did not sell any stock during this period.[55]

## C. The Motions To Dismiss

Between May 28 and December 3, 2020, three Carvana stockholders filed separate complaints in this court. The court consolidated the actions, and Plaintiffs filed a consolidated complaint (the "Complaint") on August 20, 2021.[56]

Plaintiffs alleged that the Garcias breached their fiduciary duties by forcing the Direct Offering at an artificially low price. Plaintiffs also alleged that the Direct Offering was not needed in the wake of the Pandemic because Carvana's "business model [was] almost tailor-made to profit from social distancing," Carvana was on "firm financial footing," and the Company had no urgent need to raise capital.[57] Plaintiffs theorized that the Garcias pushed the Direct Offering through quickly at an unfair price and by means of an unfair process.[58] Plaintiffs initially asserted both direct (Count I) and derivative (Count II) claims challenging this conduct, but they

---

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.* at 93–94.

[56] Dkt. 66.

[57] *Id.* ¶ 6.

[58] *Id.* ¶¶ 5–6, 111–13, 115–16, 135, 137, 140, 142, 152, 154, 156, 158, 176.

voluntarily dismissed Count I based on the Delaware Supreme Court's decision in *Brookfield Asset Management, Inc. v. Rosson*.[59]

The Garcias and Carvana moved to dismiss the Complaint on October 15, 2021, under Court of Chancery Rules 23.1, 12(b)(6), and 12(b)(2).[60] The court denied the motions in two separate decisions.[61] The court concluded that demand was excused because Plaintiffs adequately alleged that three of the six Carvana directors were either interested in the transaction or lacked independence from the Garcias.[62] The court also concluded that Plaintiffs had stated a claim and that the court had personal jurisdiction over Garcia II.[63] Garcia II filed an interlocutory appeal of the court's denial of his motion to dismiss for lack of personal jurisdiction.[64] The court denied Garcia II's application to certify interlocutory appeal on October 3, 2022, and the Delaware Supreme Court refused the appeal on October 19, 2022.[65]

---

[59] 261 A.3d 1251 (Del. 2021); *see also* Dkt. 71.

[60] Dkt. 72, Nominal Def. Carvana's Mot. to Dismiss ("Carvana's Mot. to Dismiss"); Dkt. 74, Defs. Ernest Garcia III and Ernest Garcia II's Mot. to Dismiss ("Garcia Defs.' Mot. to Dismiss").

[61] *In re Carvana Co. S'holders Litig.*, 2022 WL 2352457 (Del. Ch. June 30, 2022) ("*Carvana I*"); *In re Carvana Co. S'holders Litig*., 2022 WL 3923826 (Del. Ch. Aug. 31, 2022) ("*Carvana II*").

[62] *Carvana I* at \*6–16.

[63] *Id.* at \*16–18; *Carvana II* at \*2–7.

[64] Dkt. 102.

[65] Dkt. 109, Oct. 3, 2022, Order Refusing Certification of Interlocutory Appeal; *Garcia v. Franchi*, No. 362, 2022 (Del. Oct. 19, 2022) (ORDER).

**D. The Special Litigation Committee Investigation**

On August 15, 2022, the Company formed the SLC[66] and tasked it with investigating the claims made in the Complaint.[67] The Board appointed directors Michael Maroone and Neha Parikh to the SLC.[68]

**1. The SLC Members**

Maroone, who holds a Bachelor of Science degree in small business management from the University of Colorado Boulder,[69] has substantial experience in the automotive industry.[70] Maroone was the CEO and President of Mike Maroone Automotive Group.[71] He then served on the board of directors, as President, and as Chief Operating Officer at AutoNation, Inc.[72] Maroone also has experience serving on other boards.[73] He joined the Board in April 2017.[74] Prior to joining the Board, Maroone did not know any of the other directors or have a personal relationship with the Garcias.[75] Maroone served on the Board when it approved the Direct Offering.[76]

---

[66] SLC Report at 19.

[67] *Id.* at 6, 19.

[68] *Id.* at 6, 19.

[69] *Id.* at 23.

[70] *Id.* at 22.

[71] *Id.*

[72] *Id.*

[73] *Id.* at 23.

[74] *Id.*

[75] *Id.*

[76] *Id.* at 24.

Parikh, who holds a Master of Business Administration degree from the Kellogg School of Management at Northwestern University, has served in various executive capacities.[77] When the investigation was underway, she served as the CEO of Waze Mobile Ltd., "a company that maintains a community-driven navigation application that helps users solve transportation-related challenges."[78] From 2017 to 2019, Parikh was the President of Hotwire, Inc.[79] Parikh also has experience working in high-level positions in the Expedia Group, Inc.[80] She joined the Board in April 2019 and served on the audit committee and compensation and nominating committee.[81] Prior to joining the Board, Parikh did not know any of the other directors or have a relationship with the Garcias.[82] Parikh served on the Board when it approved the Direct Offering.[83]

### 2. The SLC Investigation

On September 27, 2022, the SLC asked the court to stay the action for six months to allow it to investigate the allegations in the Complaint.[84] On October 3,

---

[77] *Id.* at 21.

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* at 22.

[82] *Id.*

[83] *Id.* at 24.

[84] SLC Report at 20; Dkt. 106.

11

2022, the court stayed the action until April 3, 2023.[85]  The court then granted a brief extension until May 5, 2023.[86]  The investigation lasted a total of seven months.[87]

The SLC hired a legal and a financial advisor.  Carvana management provided the SLC with two recommendations for independent counsel to assist its investigation, and the SLC selected Wilson Sonsini as its counsel.[88]  The SLC selected Houlihan Lokey as its financial advisor.[89]

The SLC and Wilson Sonsini "met with co-lead counsel for co-lead Plaintiffs via Zoom to hear Plaintiffs' perspectives and theories of the case."[90]

Wilson Sonsini and counsel for Plaintiffs negotiated and set the parameters for the SLC's document collection.[91]  The negotiations resulted in a collection of "emails, text messages, electronically-stored documents, Slack messages, and notes."[92]  Wilson Sonsini collected and reviewed over 100,000 pages of documents.[93]  Wilson Sonsini reviewed 18,000 documents collected from eighteen custodians.[94]  The remaining documents included public filings, news articles, pleadings, and

---

[85] SLC Report at 20; Dkt. 110.

[86] SLC Report at 20; Dkt. 120.

[87] SLC Report at 6–7.

[88] *Id.* at 20.

[89] *Id.* at 28.

[90] *Id.* at 25.

[91] *Id.* at 26–27.

[92] *Id.* at 26.

[93] *Id.* at 7.

[94] *Id.* at 26.

documents collected in response to stockholder demands to inspect books and records.[95]

Wilson Sonsini interviewed sixteen witnesses. Among the interviewees were "the Garcias, all Board members, members of Carvana management involved in the Offering, the Company's in-house and outside counsel, and other third parties such as potential and actual investors in the Company[.]"[96]

Houlihan Lokey analyzed the Direct Offering, assessing its price, Carvana's financing needs at the time, potential alternatives, and the economic impact of the Direct Offering on the Garcias' interests.[97]

### 3. The SLC Findings

The SLC investigation resulted in a 170-page report, which concluded "that the costs associated with continuing to pursue the Action or any other claims in connection with the Direct Offering outweigh any benefits[,]" noted that the "claims against the Garcias for alleged breaches of fiduciary duty lack merit (whether assessed under the business judgment rule or the entire fairness standard)," and did not "identify any other potential claims that would be likely to succeed."[98] The SLC reached this conclusion in light of the litigation costs to the Company, stating that "[t]he prospects of a monetary recovery against the Garcias and/or Carvana's other fiduciaries for any potential claims in connection with the Direct Offering are low and

---

[95] *Id.* at 26–27.

[96] *Id.* at 27–28.

[97] *Id.* at 28.

[98] *Id.* at 169.

13

are more than offset by the costs associated with continued litigation. Likewise, pursuing a settlement is not likely to result in a material benefit to the Company."[99]

As to the remaining count of the Complaint for breach of fiduciary duty against the Garcias, the SLC concluded that "the Garcias likely would be able to present a strong argument that they were incentivized not to cause the Direct Offering to occur unless it was truly necessary and/or beneficial to the Company and that they were incentivized to maximize the price of the Direct Offering."[100] Among other things, the SLC determined that the "net impact" of the Garcias' dilution and subsequent stock purchase was "materially harmful" to their "aggregate economic interest in Carvana."[101]

The SLC Report asserted reasons why the business judgment standard might apply in the final analysis but also concluded that the claim would pass entire fairness scrutiny.

On process, the SLC concluded that there was no evidence of opportunistic timing,[102] an unengaged, controlled board in the process,[103] and "the investigatory record [did] not support that Garcia III's role in [] negotiations led to the terms of the Direct Offering being any less favorable to Carvana."[104] Concerning Carvana's use of

---

[99] *Id.* at 169–70.

[100] *Id.* at 108.

[101] *Id.* at 109.

[102] *Id.* at 116.

[103] *Id.* at 117–20.

[104] *Id.* at 123.

14

outside advisors, the SLC concluded that "the investigatory record reflects that [Carvana's advisors] well understood Carvana's capital needs, was advising the Company on its options, and was fully informed on the state of play when negotiations of the Direct Offering ensued."[105] Although the SLC recognized that the Board could have "done more to manage [Garcia III's] arguable conflicts[,] . . . appointed a special committee of independent directors to evaluate alternatives and negotiate with potential counterparties[,]" or slowed down the process, "none of those protective measures would have been consistent with the uniquely challenging dynamics facing the Board at the time."[106] Also, the SLC noted that running a "textbook" process would have cost the Company significantly more time and opportunity to complete its capital raise.[107] In sum, the SLC concluded that "the [c]ourt likely would find [that] the process leading to the Direct Offering was fair."[108]

On price, the SLC relied on Houlihan Lokey's analysis of the implied values, and that analysis showed that the implied value of Carvana stock "varied widely depending on which scenario one assumed and whether greater weight was placed on the revenue multiple or the gross profit multiple."[109] Given this variation, the $45 price fell within the range of fairness.[110] The SLC also considered data points,

---

[105] *Id.* at 123–24.

[106] *Id.* at 125–26.

[107] *Id.* at 126.

[108] *Id.* at 127.

[109] *Id.* at 130.

[110] *Id.*

including historical averages, historical performance versus peer groups, analyst reports, and Carvana's liquidity outlook.[111]

The SLC also considered the size of the offering, noting that outside analysts' and representatives' estimates were in line with an offering of $500 million to $700 million.[112] In addition, the SLC noted that the Garcias' $50 million investment in the Direct Offering was fair because it was expected by many of the investors in the Direct Offering and was relatively small compared to the Garcias' pre-offering ownership percentage.[113] The SLC investigated alternative transactions and concluded that those options—including raising debt—would have been too slow to execute given the market conditions at the time.[114]

The SLC determined "that the Direct Offering's price was the result of a bona fide negotiation between Carvana management . . . and the lead investor in the Offering, T. Rowe[.]"[115] The SLC noted the back and forth in the negotiation and that one of T. Rowe's funds "passed" on the $45 price because it was too high.[116] Together, these elements also bolstered the process analysis, showing that the price "replicated" an arm's length-negotiated price in the absence of any conflict.[117]

---

[111] *Id.* at 130–31.

[112] *Id.* at 133–34.

[113] *Id.* at 135–36.

[114] *Id.* at 139.

[115] *Id.* at 131.

[116] *Id.* at 132.

[117] *Id.*

Taking all these considerations into account, the SLC concluded that the Direct Offering is entirely fair.[118]

After considering the transaction under the entire fairness standard, the SLC also analyzed whether the Garcias could be subject to personal liability for breach of fiduciary duty.[119] The SLC concluded that the evidence showed that Garcia III did not act in bad faith or with gross negligence.[120] The same was true for Garcia II.[121]

The SLC considered whether the Company would be able to pursue claims for breach of fiduciary duty against other Carvana directors and officers in connection with the Direct Offering, an unjust enrichment claim against the Garcias, and claims against the Company's advisors and participants in the Direct Offering.[122] The SLC concluded that none of the Carvana directors—even those alleged to be conflicted (Ira Platt and Gregory Sullivan)—could be shown to have favored the interests of the Garcias over the Carvana stockholders, conflicts and personal relationships notwithstanding.[123] The same was true for Carvana management.[124]

As for unjust enrichment, the SLC concluded that there was no evidence that the Garcias were enriched or that the Direct Offering impoverished Carvana or its

---

[118] *Id.* at 140.

[119] *Id.* at 143.

[120] *Id.* at 143–46.

[121] *Id.* at 146–48.

[122] *Id.* at 96–97.

[123] *Id.* at 150–54.

[124] *Id.* at 155–58.

stockholders, so any such claim was deemed likely to fail.[125] And the SLC concluded that no viable aiding and abetting claims existed against any third party.[126]

### 4. The SLC Motion

On May 12, 2023, the SLC moved to terminate the litigation.[127] It filed its opening brief on October 18, 2023.[128] The parties completed briefing on December 11, 2023, and the court heard oral argument on December 18, 2023.[129]

## II. LEGAL ANALYSIS

*Zapata* calls for a two-step analysis. In the first step, the court must "review[] the independence of SLC members and consider[] whether the SLC conducted a good faith investigation of reasonable scope that yielded reasonable bases supporting its conclusions."[130] In the second step, the court applies "its own business judgment to the facts to determine whether the corporation's best interests would be served by dismissing the suit."[131]

*Zapata* motions present an "atypical procedural posture"—a "hybrid between Court of Chancery Rules 41(a)(2) and 56."[132] "To terminate derivative litigation, the

---

[125] *Id.* at 159–61.

[126] *Id.* at 161–63.

[127] Dkt. 122.

[128] Dkt. 132 ("SLC's Opening Br.").

[129] *See* Dkt. 134 ("Pls.' Answering Br."); Dkt. 138 ("SLC's Reply Br.").

[130] *Diep ex rel. El Pollo Loco Hldgs., Inc. v. Sather*, 2021 WL 3236322, at *14 (Del. Ch. July 30, 2021) (citing *London v. Tyrrell*, 2010 WL 877528, at *11 (Del. Ch. Mar. 11, 2010)), *aff'd*, 280 A.3d 133 (Del. 2022).

[131] *Id.* (citing *London*, 2010 WL 877528, at *11).

[132] *El Pollo Loco*, 280 A.3d at 151.

18

SLC must show, and the court must be satisfied, that no disputed issues of material fact exist about the independence, good faith, and reasonableness of the SLC's investigation and whether the SLC had reasonable bases for its conclusion."[133]

## A. The First Step

In the first step of *Zapata*,

> the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. . . . The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness. If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion.[134]

The court thus evaluates the independence of the SLC members, along with the reasonableness of their investigation and their conclusions.

### 1. The SLC Members Were Independent.

Concerning the independence analysis called for by *Zapata*, the Delaware Supreme Court has explained:

> In most challenges to director independence, the court must confront the personal and professional relationships between those who judge and those being judged. Directors have relatives and friends. They have acquaintances who may be classmates, professional associates, or business contacts. They hold memberships in clubs and other organizations and have political affiliations. They own property, make financial investments, and have other business activities. It is a fact of life that "business dealings

---

[133] *Id.*

[134] *Zapata*, 430 A.2d at 788–89.

seldom take place between complete strangers" and "it would be a strained and artificial rule which required a director to be unacquainted or uninvolved with fellow directors in order to be regarded as independent."[135]

The SLC "bear[s] the burden of proving that there is no material question of fact about their independence" because "the situation is typically one in which the board as a whole is incapable of impartially considering the merits of the suit."[136] Still, "the substantive contours of the independence doctrine" remain unchanged from the demand futility context.[137] "At bottom, the question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind," and the analysis, therefore, focuses on "impartiality and objectivity."[138]

Under this inquiry, the court considers the many factors that "[go] beyond determining whether SLC members are under the 'domination and control' of an interested director," and includes "lesser affiliations" that can impair independence

---

[135] *El Pollo Loco,* 280 A.3d at 151–52.

[136] *El Pollo Loco*, 2021 WL 3236322, at *15 (citing *London*, 2010 WL 877528, at *13).

[137] *Id.* at *15 & n. 216 (quoting *London*, 2010 WL 877528, at *13 ("[I]t is conceivable that a court might find a director to be independent in the pre-suit demand context but not independent in the *Zapata* context. . . . [I]t is primarily a function of the shift in the burden of proof from the [p]laintiff to the corporation when the suit moves from the pre-suit demand zone to the *Zapata* zone.")).

[138] *Id.* at *15 (emphasis added) (citing *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003)).

20

if they "present a material question of fact as to whether the SLC member can make a totally unbiased decision."[139]

"Given the common personal and professional relationships between board members, the independence question 'is a fact-specific determination made in the context of a particular case.'"[140] The analysis calls on the court to determine whether the director was positioned to "base [the director's] decision on the merits of the issue rather than . . . extraneous considerations or influences."[141] This requires the court to "ask whether the SLC member would be more willing to risk her reputation than the personal and professional relationship with the director subject to investigation."[142] The analysis is thus contextually "tailored"—because the court may presume that "special litigation committee members are persons of typical professional sensibilities," the key inquiry is whether "an unacceptable risk of bias" is present.[143]

Plaintiffs advance four arguments to impugn the SLC members' independence. First, they argue that Maroone and Parikh were "improperly influenced" by the SLC's outside counsel, Wilson Sonsini.[144] Second, they argue that Maroone and Parikh had

---

[139] *In re Baker Hughes, a GE Co., Deriv. Litig.,* 2023 WL 2967780, at *11 (Del. Ch. Apr. 17, 2023), *aff'd, In re Hughes*, 2024 WL 371962 (Del. Feb 1. 2024) (TABLE).

[140] *El Pollo Loco*, 280 A.3d at 152 (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004)).

[141] *Id*. (quoting *Kaplan v. Wyatt,* 499 A.2d 1184, 1189 (Del. 1985)).

[142] *Id* (citing *Beam*, 845 A.2d at 1052).

[143] *Oracle*, 824 A.2d at 941–42, 947.

[144] Pls.' Answering Br. at 18.

a personal interest in the investigation due to potential liability in two other Carvana-related lawsuits.[145] Third, they argue that Maroone and Parikh prejudged the merits of the investigation.[146] Finally, they argue that Maroone was both financially and personally compromised.[147]

To start, Plaintiffs argue that the SLC was improperly influenced by outside counsel. Their sole support for this theory is the fact that Carvana management recommended Wilson Sonsini. When the SLC was formed, Carvana's General Counsel Paul Breaux presented the SLC with two options for counsel and made it clear that the SLC could "select[] whatever counsel [it] wish[ed.]"[148] Plaintiffs' story is that those two firms were hand-picked by management to be interviewed, the SLC only interviewed those two firms and then hired one of them. According to Plaintiffs, this sequence of events "raises serious questions about the SLC members' independence."[149] But this is a bad argument. Accepting a recommendation from management alone does not evidence a lack of independence of the SLC, and that is all that happened here.

Second, Plaintiffs argue that the SLC members were compromised by separate lawsuits against them. The first, a federal securities lawsuit, involved claims of

---

[145] *Id.* at 20–21.

[146] *Id.* at 26–28.

[147] *Id.* at 26 n.113.

[148] SLC's Opening Br., Ex. G at ZAP_CVNA_SLC_005169; Parikh Dep. Tr. at 36:8–9.

[149] Pls.' Answering Br. at 18.

insider trading and listed Maroone and Parikh as defendants alongside Garcia II.[150] The second, filed in this court, involved *Brophy* claims and listed Maroone and Parikh as defendants alongside the Garcias and Carvana directors and officers.[151] Plaintiffs argue that the SLC members' status as investigation targets and defendants in concurrent litigation raises the possibility that they might not have made a "totally unbiased decision" when they decided to terminate this litigation.[152]

This theory might gain traction in other circumstances. But neither of these cases impugn the SLC's independence here because those cases are not related to this case. The other actions concern events that occurred after the Direct Offering. Also, in the securities action, Maroone and Parikh are named defendants under a strict liability theory because they are board members; the complaint does not allege that they engaged in wrongdoing. Indeed, Maroone was not aware of the securities action during his deposition.[153] It is unclear how an unrelated securities action about events that occurred after the events scrutinized in the report would compromise the SLC members. The same is true for the fiduciary action. The complaint in that action was filed after the SLC Report was released.[154]

---

[150] *See* Lead Plaintiffs' Consol. Complaint for Violations of the Federal Securities Laws ¶ 415, *In re Carvana Co. Sec. Litig.*, No. 2:22-cv-02126-MTL, (D. Ariz. Feb. 14, 2023), ECF No. 36.

[151] *See Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949); *Schertz v. Garcia, et al.*, C.A. No. 2023-0600-KSJM, Dkt. 1 (Del. Ch. June 7, 2023).

[152] *London*, 2010 WL 877528, at *12.

[153] Maroone Dep. Tr. at 237:18–19. Plaintiffs did not ask Parikh about the securities action.

[154] *Schertz v. Garcia, et al.*, C.A. No. 2023-0600-KSJM, Dkt. 1 (Del. Ch. June 7, 2023).

Third, Plaintiffs argue that the SLC members prejudged the investigation. In order to establish that an SLC member prejudged the merits, there must be more than "[m]ere familiarity" with the issue.[155] Although operating "with the object of putting together a report that demonstrates the suit has no merit . . . will create a material question of fact as to the SLC's independence," "simply [being] exposed to or . . . familiar with a derivative suit . . . may not be enough to create a material question."[156] An SLC member must have "approved or participated in a substantive way in the decision to file the motion" in order for the court to find that the merits were prejudged.[157]

Plaintiffs identify two factual bases for arguing that the SLC members prejudged the investigation. First, both SLC members voted to approve it in March 2020.[158] Second, both SLC members "supported or acquiesced to" the motion to dismiss in the underlying case.[159]

The first argument fails under Delaware law. Generally speaking, a director's approval of a transaction does not establish the director's inability to impartially take action with respect to that transaction at a later time.[160]

---

[155] *El Pollo Loco*, 280 A.3d at 154 ("Mere familiarity with an issue does not compromise independence." (citing *Katell v. Morgan Stanley Gp. Inc.*, 1995 WL 376952, at *10 (Del. Ch. June 15, 1995))).

[156] *London*, 2010 WL 877528, at *15.

[157] *El Pollo Loco*, 280 A.3d at 153.

[158] Pls.' Answering Br. at 27.

[159] *Id.*

[160] *See Kaplan*, 499 A.2d at 1189 ("[A] director's approval of the transaction in question does not establish a lack of independence.").

24

The second argument is stronger, but it too fails. For this proposition, Plaintiffs rely on two cases, *El Pollo Loco* and *London*, but neither provides support.[161]

*El Pollo Loco* illustrates that an SLC member's mere presence on a board when a motion to dismiss is filed does not create a disabling conflict. There, SLC members attended the board meeting and discussed the motion. The plaintiffs argued that an inference of prejudgment should be made because the members "reviewed, analyzed, and prejudged the merits" of the litigation.[162] The court rejected this argument, and the high court affirmed on appeal. The Delaware Supreme Court explained that the driving factor is whether SLC members "approved or participated in a *substantive way* in the decision to file the motion."[163] Here, both SLC members' only knowledge regarding the decision was based on updates received at Board meetings.[164] And the Board did not vote on whether the Company would dismiss the motion.[165] The SLC members did not participate in a substantive way in the decision to file the motion.

*London* stands for the proposition that:

> [I]f evidence suggests that the SLC members prejudged the
> merits of the suit based on . . . prior exposure or familiarity,
> and then conducted the investigation with the object of
> putting together a report that demonstrates the suit has no

---

[161] Pls.' Answering Br. at 26–27 (citing *El Pollo Loco*, 280 A.3d at 152–55; *London*, 2010 WL 877528, at *15).

[162] *El Pollo Loco*, 2021 WL 3236322, at *16.

[163] *El Pollo Loco*, 280 A.3d at 153 (emphasis added).

[164] SLC's Reply Br. at 15.

[165] SLC's Opening Br. at 47.

merit, this will create a material question of fact as to the SLC's independence.[166]

There, the SLC members, through their investigation, admitted that they "*attacked .*
*. .* "the merits of [the] plaintiffs' claims, rather than objectively considering [the] plaintiffs' claims."[167]   Here, the SLC members did not "attack" the investigation or even act in a manner resembling an attack.

Finally, Plaintiffs argue in a footnote that Maroone had disabling financial conflicts due to having "on several occasions, engaged in business deals with the Garcias."[168]  Specifically, Maroone's auto dealerships participated in a Carvana pilot program and Maroone's dealership leased storage from the Garcias months after the SLC investigation.[169]  Plaintiffs do not elaborate on the magnitude of these business dealings or how they might have affected Maroone.  On their face, the allegations do not seem significant.

The SLC has demonstrated its independence for the purposes of *Zapata*.

### 2.     The SLC Conducted A Reasonable Investigation In Good Faith.

In addition to establishing its independence, an SLC must "prove also that it conducted a reasonable investigation of the matters alleged in the complaint in good faith."[170]  "A good faith investigation is one that is pursued in an unbiased manner

---

[166] *London*, 2010 WL 877528, at *15.

[167] *Id.* at *16 (emphasis in original)

[168] Pls.' Answering Br. at 26 n.113.

[169] Maroone Dep. Tr. at 27:18–28:25.

[170] *El Pollo Loco*, 2021 WL 3236322, at *19 (citing *Kaplan*, 484 A.2d at 507).

and without a predetermined conclusion."[171] The SLC bears the burden of proving that it "acted in good faith and conducted a thorough investigation."[172] An SLC must engage in a reasonable investigation, not a "selective investigation[.]"[173]

A reasonable SLC investigation should "thoroughly investigate[] the factual elements underlying" the plaintiffs' claims and should result in "an in depth inquiry and . . . [a] well documented report."[174] It should also "investigate all theories of recovery asserted in the plaintiffs' complaint" and "explore all relevant facts and sources of information that bear on the central allegations in the complaint."[175] Further, "[t]o demonstrate that its recommendations are supported by reasonable bases, the SLC must show that it correctly understood the law relevant to the case."[176]

The SLC investigation lasted seven months and included 100,000 pages of documents, 16 witness interviews, and nine SLC meetings. These efforts compare favorably with SLC investigations upheld by this court.[177] Plaintiffs, though, attack

---

[171] *Baker Hughes*, 2023 WL 2967780, at *17 (quoting *London*, 2020 WL 877528, at *11).

[172] *Id.* (quoting *London*, 2020 WL 877528, at *11).

[173] *El Pollo Loco*, 2021 WL 3236322, at *19 (citing *Sutherland*, 958 A.2d at 244).

[174] *Id.* (quoting *Kahn v. Kolberg Kravis Roberts 8 Co., L.P.*, 23 A.3d 831, 842 (Del. 2011)).

[175] *Id.* (quoting *London*, 2010 WL 877528, at *17).

[176] *Id.* (quoting *London*, 2010 WL 877528, at *17).

[177] *Compare with Baker Hughes*, 2023 WL 2967780, at *8, *17 (stating that the investigation lasted nine months and involved reviewing more than 110,000 documents and interviewing 22 witnesses); *El Pollo Loco*, 2021 WL 3236322, at *12–13 (stating that the investigation lasted over a year and involved reviewing over 249,000 documents and interviewing 14 witnesses, in addition to reviewing 14 deposition transcripts).

the thoroughness and scope of the investigation and the reasonableness of its conclusions.

### a. Thoroughness

Plaintiffs argue that the SLC members failed to thoroughly investigate Plaintiffs' claims in seven ways.

First, Plaintiffs argue that the SLC members' conflicts made them "[b]arely [p]articipate[] in the [i]nvestigation" and rendered them too "passive[.]"[178] Plaintiffs rely on *In re Oracle Corp. Derivative Litigation,* where this court observed that there "are dangers posed by investigators who harbor reasons not to pursue the investigation's targets with full vigor."[179] In *Oracle,* however, the court found that the SLC members had close ties to the targets of the investigation and thus had a reasonable motivation for their less-than-vigorous performance.[180] This decision has already rejected Plaintiffs' arguments attacking the independence of Maroone and Parikh. There is no reason to think that Maroone and Parikh harbored any conflicts that prompted them to do a less-than-vigorous job.

Second, Plaintiffs argue that Wilson Sonsini played an outsized role in the investigation because the SLC members delegated the development of the investigation plan, identification of document custodians, creation of search terms,

---

[178] Pls.' Answering Br. at 21–25.

[179] *Id.* at 25–26 (quoting *Oracle,* 824 A.2d at 941).

[180] *Oracle,* 824 A.2d at 920.

and administration of interviews.[181]   But this level of delegation is in line with precedent.

In *Baker Hughes*, the SLC relied heavily on counsel.  Counsel identified relevant participants in the underlying transaction, coordinated interviews, and controlled communications with the financial advisor.  The court found that this was not unreasonable.  In fact, the court held that "[t]he SLC's reliance on experienced advisors 'is not only allowed but is evidence [of] good faith and the overall fairness of the process.'"[182]

Similarly, in *Carlton Investments v. TLC Beatrice International Holdings, Inc.* "the SLC delegated a large percentage of [the] work to its counsel and their expert assistants."[183]   The counsel "spent over 4000 hours reviewing facts and then presenting the information," while the SLC members only spent about "100 hours."[184] Although the "SLC's counsel performed the vast preponderance of the legal and factual research required to analyze the eleven claims," the court still found that the SLC investigated in good faith.[185]   The court observed that "[w]hile the directors bear ultimate responsibility for making informed judgments, good faith reliance by a[n]

---

[181] Pls.' Answering Br. at 21–22.

[182] *Baker Hughes*, 2023 WL 2967780, at *18 (alteration in original) (quoting *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *23 n.67 (Del. Ch. May 22, 2000)).

[183] 1997 WL 305829, at *8 (Del. Ch. May 30, 1997).

[184] *Id.*

[185] *Id.* at *12.

SLC on independent, competent counsel to assist the SLC in investigating claims is legally acceptable, practical, and often necessary."[186]

Here, less delegation occurred than in *Baker Hughes* and *Carlton*. SLC members met formally nine times and informally many times;[187] they participated in decisions regarding sources of document collection, identification of document custodians, and what third-party witnesses should be contacted;[188] and they attended the interviews of Garcia III, Garcia II, Mark Jenkins, Paul Breaux, Ira Platt, former Vice President Dan Quayle, and Gregory Sullivan.[189] The record indicates that the SLC's level of engagement was sufficient.

Third, Plaintiffs argue that the SLC members lacked knowledge of the investigation because they could not remember details of the investigation when interviewed.[190] But memory is a fleeting thing. That is why humans write things down. And this court has held that, as long as the conclusion is "well documented" and "supported by facts," an SLC member's "lack of recall . . . is not significant."[191] Here, the report is exhaustive, it is well documented, and it includes the relevant facts. So, the SLC members' lack of memory is not an indication that the investigation was not performed in good faith.

---

[186] *Id.*

[187] SLC's Reply Br. at 20.

[188] *Id.*

[189] *Id.* at 22.

[190] Pls.' Answering Br. at 22–24.

[191] *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2023 WL 7986729, at *30 (Del. Ch. Nov. 17, 2023).

Fourth, Plaintiffs highlight "concerning statements" made by Maroone.[192] When interviewed, Maroone explained that he "was concerned about how much time [the SLC process] would take."[193] He also jokingly stated that he "wasn't honored" to join the SLC.[194] Additionally, Maroone discussed the role with Breaux, stating that he had "no staff" and viewed serving on the SLC as "a part-time responsibility."[195] He worried that someone else should take on the role unless "the involvement [was] minimal and include[d] no personal exposure[.]"[196]

Comments of this nature are not helpful to an SLC's cause. As explained above, however, Plaintiffs have not shown that Maroone failed to conduct the investigation in good faith once he committed to the role. Similar arguments were raised in *Baker Hughes*. There, the plaintiffs noted that an SLC member "conceded his 'lack of enthusiasm' for the SLC investigation, which he dismissed as 'an understandable consequence of serving on an SLC.'"[197] Maroone's lack of enthusiasm for the job was honest. It was perhaps too honest. However, there is no evidence that it affected his diligence. It does not render the SLC's investigation unreasonable or evidence bad faith.

---

[192] Pls.' Answering Br. at 24–25.

[193] *Id.*

[194] *Id.* at 25.

[195] Maroone Dep. Tr. at 182:6–8.

[196] Pls.' Answering Br. at 25.

[197] *In re Baker Hughes, a GE Co. Deriv. Litig.,* C.A. No. 2019-0201-LWW, Dkt. 137 at 5 (Del. Ch. Aug. 25, 2022).

Fifth, Plaintiffs argue that the SLC did not sufficiently engage in witness interviews. Plaintiffs' contentions regarding witness interviews are as follows: first, SLC members did not attend all interviews; second, Mark Walter was interviewed after the SLC reached its decision; third, the SLC prepared interview summaries after it made its decision; fourth, SLC members failed to provide specific evidence that they reviewed interview summaries, and fifth, it is implausible that Maroone came to his conclusions after only reviewing summaries.[198]

Plaintiffs' contentions regarding the sufficiency of the SLC's witness interview process are unpersuasive. To start, the delegation of witness interviews to SLC counsel does not undermine an investigation's integrity. Precedent establishes that such delegation "is not only allowed but is 'evidence [of] good faith and the overall fairness of the process.'"[199] For instance, in *Katell v. Morgan Stanley Group, Inc.*, the SLC fully delegated all interviews to counsel yet the court found the investigation was conducted in good faith.[200] Here, the SLC members themselves attended many key interviews and actively reviewed draft summaries as they were prepared prior to making their final decision, belying any claim of rubber-stamping the process.[201] One or both SLC members attended the interviews of Garcia III, Garcia II, Mark Jenkins, Paul Breaux, Ira Platt, former Vice President Dan Quayle, and Gregory

---

[198] Pls.' Answering Br. at 29–32.

[199] *Baker Hughes*, 2023 WL 2967780, at *18 (alteration in original) (quoting *W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *23 n.67).

[200] 1995 WL 376952, at *9–10 (Del. Ch. June 15, 1995).

[201] SLC's Reply Br. at 22–23.

Sullivan.[202] The SLC members also received draft summaries of all interviews, except Walter's, on a rolling basis prior to their final decision. Both members testified that they reviewed these summaries as they were prepared.[203]

Plaintiffs' other arguments regarding the purported evidentiary deficiencies of the interview summaries and timing are equally unavailing. The dates on the finalized summaries reflect administrative wordsmithing, not their initial preparation and review by the SLC members.[204] And although Walter's interview postdated the SLC's decision, his limited role in the investigation and the Direct Offering makes that timing immaterial.[205] Further, Plaintiffs' implication that the SLC members did not actually review the summaries is entirely speculative and contradicted by Maroone's testimony confirming receipt and consideration of the drafts.[206] In sum, the record amply demonstrates the SLC's good faith efforts to thoroughly investigate the allegations through a reasonable interview process.

Sixth, Plaintiffs take aim at the timing of the release of Houlihan Lokey's final report.[207] Although the final presentation was dated after the SLC decided to terminate the litigation and one day before filing its report, this chronology alone

---

[202] *Id.* at 22.

[203] *Id.* at 23.

[204] *Id.* at 23 n.83.

[205] *Id.* at 23–24.

[206] Pls.' Answering Br. at 31–32.

[207] *Id.* at 53–54.

33

does not indicate a "conclude first, fill-in-details later approach[.]"[208] The record reflects that the SLC reviewed Houlihan Lokey's analyses and conclusions prior to moving to terminate the litigation.[209] And though Plaintiffs criticize Maroone's purported equivocation about reviewing the report,[210] "lack of recall. . . is not significant."[211] Moreover, Maroone made clear he did review the summaries, with his only hesitation being the exact date.[212] Further, the court pushed the SLC to conclude its investigation timely so that, in the event it recommended that the litigation proceed or the court denied any motion to terminate, Plaintiffs' claims were not prejudiced by delay.

Finally, Plaintiffs argue that the SLC should have gathered text messages from Platt and Sullivan, as well as Garcia II, Garcia III, Breaux, Jenkins, and Maroone. But the SLC conducted an expansive document collection. It included emails, electronic documents, Slack messages, and text messages from 18 custodians. In this context, the SLC's motion cannot stand or fall on a failure to gather text messages. Plaintiffs' critique of the information gathering, as well as their other criticisms, falls short of raising a material question considering the strength and thoroughness of the SLC's investigation into Plaintiffs' claims.

---

[208] *Id.* at 33–34.

[209] For instance, the March 28 meeting minutes show discussion of Houlihan Lokey's analysis, and the firm provided a draft report on April 4, which the SLC discussed on April 6. SLC's Reply Br. at 24.

[210] Pls.' Answering Br. at 33–34.

[211] *Teamsters Local 443 Health Servs.*, 2023 WL 7986729, at *30.

[212] Pls.' Answering Br. at 33–34.

### b. Scope

Plaintiffs argue that the SLC allegedly failed to consider "critical aspects" of their claims in reaching its conclusions. "If the SLC fails to investigate facts or sources of information that cut at the heart of plaintiffs' complaint this will usually give rise to a material question about the reasonableness and good faith of the SLC's investigation."[213] "Where the SLC decides 'not to explore specific acts of alleged misconduct,' it must 'carefully analyze whether a summary investigation of those specific acts could shed light on the more serious allegations,' because a 'total failure to explore the less serious allegations in plaintiffs' complaint may cast doubt on the reasonableness and good faith of an SLC's investigation.'"[214]

First, Plaintiffs assert that the SLC failed to consider Garcia II's stock sales, but that is incorrect. The SLC investigated Garcia II's stock sales, and the SLC Report addressed them. The report states that "there is no basis to conclude that Garcia II could have predicted that Carvana's stock price would climb as it did in the months following the Direct Offering."[215] The report also found that "Garcia II did not sell any shares of the Class A common stock he purchased in the Direct Offering . . . [i]nstead, the stock sales . . . originated from his LLC units in Carvana Group, LLC, which Garcia II had held since Carvana's IPO[.]"[216]

---

[213] *El Pollo Loco,* 2021 WL 3236322, at *19 (quoting *London*, 2010 WL 877528, at *17).

[214] *Id.* (quoting *London*, 2010 WL 877528, at *17).

[215] SLC Report at 148.

[216] *Id.*

Plaintiffs argue that the SLC Report "glosses over key information regarding the stock sales"[217] and made a "suspicious[]" mistake when it described Garcia II's stock sale as one of two million dollars instead of shares.[218]  In support, Plaintiffs cite *Sutherland v. Sutherland*.[219]  There, the SLC report completely omitted central information,[220] and the SLC member failed to record "several of the most important interview[] . . . answers"[221] or take notes when reviewing ledgers that witnesses found relevant to the investigation.[222]  No similar omissions occurred here.  Although the facts may not have been discussed to the extent Plaintiffs wish, they were included in the SLC Report.  Plaintiffs also assert that the SLC members did not investigate Garcia II's 10b5-1 trading plan,[223] noting that Parikh and Maroone failed to recall details regarding the plan.[224]  Yet, the SLC Report addressed the trading plan and attached the plan for reference.[225]

Second, Plaintiffs argue that the SLC did not adequately investigate the non-ratable benefits the Garcias allegedly received from the Direct Offering.[226]

---

[217] Pls.' Answering Br. at 39.

[218] *Id.* at 40 ("Maroone acknowledged this was yet another 'mistake' at his deposition.").

[219] 958 A.2d 235, 242–43 (Del. Ch. 2008).

[220] *Id.* at 242.

[221] *Id.* at 243.

[222] *Id.* at 243–44.

[223] Pls.' Answering Br. at 38.

[224] *Id.* at 38–39.

[225] SLC Report at 93; Ex. 84 (Garcia II's 10b5-1 Sales Plan).

[226] Pls.' Answering Br. at 41.

Plaintiffs argue that "nowhere in the Report or any of the supporting documentation did the SLC undertake any effort to investigate whether" unaffiliated stockholders had the ability to purchase shares in the public market at the same price as the Direct Offering.[227] But the report addresses this issue. It includes a Carvana share price chart and findings from Houlihan Lokey that stated "Carvana's trading volume on April 2 and April 3, 2020[,] was over 3 million shares per day, which indicates more than sufficient liquidity and volume for any non-participating Carvana stockholder who wanted to purchase additional Carvana Class A common shares to do so on those days."[228]

In its report, the SLC concluded that "the economic dilution [the Garcias] suffered from the Direct Offering far outweighed any benefit they received from participating"[229] and that the Garcias were "diluted far more than any other stockholder on an absolute dollar value basis[.]"[230]

Plaintiffs argue that Houlihan Lokey's analysis supporting these conclusions was "flawed or otherwise supports Plaintiffs' claims" for two reasons.[231] First, Houlihan Lokey did not "perform[]" an "analysis of whether" the economic value earned was "material to the Garcias."[232] However, the Garcias ended up "hundreds

---

[227] *Id.*

[228] SLC Report at 111 n.418.

[229] *Id.* at 109.

[230] *Id.* at 28–29.

[231] Pls.' Answering Br. at 41.

[232] *Id.* at 42.

of millions of dollars *worse off* than they would have been had the Direct Offering not occurred at all."[233]  The suggested analysis was unnecessary.  Second, Plaintiffs find error with the discount calculation Houlihan Lokey used when it performed a comparison to discounts used in other equity offerings at the same time.[234]  This contention was already addressed by John Taylor of Houlihan Lokey in his deposition.[235]  Regardless, the dispute is not very meaningful—the implementation of Plaintiffs' critiques would change the median discount by less than two percent.[236]

Third, Plaintiffs argue that the SLC Report failed to address "two dozen related-party transactions with Garcia-affiliated entities in 2019 and 2020[.]"[237]  Yet the SLC determined that "none of the transactions had a connection to the Direct

---

[233] SLC's Reply Br. at 29–30 (emphasis in original).

[234] Pls.' Answering Br. at 44.

[235] SLC's Opening Br. at 36 ("Taylor testified at length why Houlihan Lokey's methodologies were reasonable notwithstanding Plaintiffs' disagreements with them." (citing Taylor Dep. Tr at 202:14–205:5)).

[236] SLC's Reply Br. at 30.  Plaintiffs identify two aspects of Houlihan Lokey's analysis that they say support their position.  First, Plaintiffs argue that Houlihan Lokey's analysis "confirms that Carvana's liquidity outlook in March 2020 was strong." Pls.' Answering Br. at 42.  This seems to exaggerate the findings.  The report indicates that "Carvana might have been able to stay alive for twelve months without a cash infusion—but only if it went into 'survival mode.'"  *Id.* at 44.  Second, Plaintiffs contend that Houlihan Lokey's analysis "confirmed that . . . Garcia III steered the Company into the transaction."  *Id.*  The proof for this serious assertion is that the report found that "all of the alternatives were reasonable and that none of them w[ere] impossible" and that there was a lack of assessment regarding whether a lower equity raise would have been adequate. *Id.* at 43.  In all events, the fact that Plaintiffs liked aspects of Houlihan Lokey's report suggests that it gave the SLC a balanced take on Plaintiffs' claims.

[237] *Id.* at 47.

Offering" and so the investigation into these transactions was not worth the cost.[238] From this conclusion, there is no reason to believe these allegations bear on the fundamental theories of recovery.

Fourth, Plaintiffs advance that the SLC failed to sufficiently investigate directors Platt and Sullivan.[239] Plaintiffs assert that the SLC Report's conflict analysis was detail-free, "eliding" the ties between Platt and the Garcias.[240] But the SLC did investigate the directors and their conflicts and found that although "neither [were] independent from the Garcias as a matter of law, both acted independently and loyally to Carvana regarding the Direct Offering."[241] The SLC interviewed both Platt and Sullivan and made reasonable conclusions as to each, and so this argument lacks merit.

In sum, the SLC's investigation and report adequately considered the allegations contained in the Complaint and evaluated the facts and law relevant to those allegations. The SLC has met its burden of establishing that its investigation was reasonable in scope.

### c. Bases

Plaintiffs contend that the SLC did not have reasonable bases for its conclusions. Plaintiffs draw comparisons to *In re WeWork Litigation* where the court

---

[238] SLC's Opening Br. at 36–37.

[239] Pls.' Answering Br at 48; *Carvana I* at *8–16.

[240] Pls.' Answering Br at 48.

[241] SLC's Reply Br. at 31.

found an SLC investigation unreasonable.[242] There, "[u]nlike a typical *Zapata* special litigation committee, the [SLC] did not investigate the factual allegations of the Special Committee's Complaint and offer[ed] no opinion on the merits of the Company's claims against SBG and Vision Fund."[243] Plaintiffs argue that "[t]he deficiencies here are similarly egregious," but this contestation is based on allegations that the court has already rejected—Maroone's "self-serving" and supposedly "false testimony" and his alleged prejudgment of the claims' merits. Again, neither set of allegations moves the needle. Through its investigation and report, the SLC met its burden and established that its conclusions were the product of a reasonable, good faith investigation. None of Plaintiffs' arguments raise a genuine question of material fact as to the thoroughness of the investigation, the reasonableness of the scope of the SLC's investigation, or the presence of reasonable bases for the SLC's conclusions.

## B. The Second Step

The court's "task in the second step is to determine whether the SLC's recommended result falls within a range of reasonable outcomes that a disinterested and independent decision maker for the corporation, not acting under any compulsion and with the benefit of the information then available, could reasonably accept."[244]

---

[242] Pls.' Answering Br. at 54.

[243] *In re WeWork Litig.*, 250 A.3d 976, 997 (Del. Ch. 2020).

[244] *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 468 (Del. Ch. 2013); *accord Obeid v. Hogan*, 2016 WL 3356851, at *12 n.14 (Del. Ch. June 10, 2016) (collecting cases). The second step of the *Zapata* analysis has been described by Delaware courts as "the essential key," on the one hand, *Zapata*, 430 A.2d at 789, and "discretionary" on the

The court has already probed Plaintiffs' challenge to the SLC's investigation and findings and found that the scope of the investigation and conclusions were reasonable. That analysis informed the conclusion that the recommended result is appropriate. At bottom, a disinterested and independent decision-maker for the Company, not acting under any compulsion and with the benefit of the information available to the SLC, could reasonably accept the SLC's recommendation to dismiss Plaintiffs' claims.

## III. CONCLUSION

The SLC's motion to dismiss is granted.

---

other. *Kaplan*, 484 A.2d at 520; *accord WeWork*, 250 A.3d at 1012–13 (noting that the second step "*permits* the court in its *discretion* to use its own independent business judgment in determining whether the motion to dismiss should be granted" (emphasis added) (internal quotation marks omitted)); *Sutherland*, 658 A.2d at 239 (noting that "the court *may* nonetheless exercise its own business judgment and deny the motion to dismiss" (emphasis added)). Given the salutary and "innovative" nature of the second step, this jurist is inclined to view it as essential. *See Obeid*, 2016 WL 3356851, at *12.